[Crim. No. 22634. First Dist., Div. One. Oct. 8, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ALONZO FULLER, Defendant and Appellant.

**COUNSEL**

William M. Robinson, under appointment by the Court of Appeal, Paul W. Comiskey, and Comiskey & Robinson for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Herbert F. Wilkinson, Michael Buzzell and Donna B. Chew, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BANCROFT, J.***—Defendant Fuller appeals from a judgment convicting him of assaulting Diana with intent to commit rape while on parole from a previous conviction of rape. (Pen. Code, §§ 220, 1203.085, 667.5, subd. (b).)

Shortly after Diana alighted from a bus at Foothill and 55th in Oakland and commenced walking home at approximately 10 p.m., October 21, 1980, she was accosted by a black male she had observed following her. He jumped in front of her grabbing her arms. She screamed and struggled as he tried to pull her toward some bushes and trees. He demanded: ''Give me some pussy'' and ''Drop your clothes right here.''

The struggle proceeded to the street where a passing motorist (Mr. H) stopped, exited his vehicle and inquired whether Diana knew her assailant. When she answered ''No. He tried to rape me,'' the assailant released her, threatened to kill her, hit her on the head, kicked her in the leg and ran away. Additional facts, as necessary, will be mentioned in the course of this opinion.

Before the jury, the defense was alibi and the critical question was one of identification. On appeal, Fuller claims reversible error in that the jury selection process was invalid, the prosecution improperly withheld discovery pertinent to identification and the court failed to give instructions defining rape.

At the outset, we confront Fuller's contention that the prosecution used peremptory challenges to remove three black perspective jurors on the sole ground of group bias in violation of the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.[1] Since we conclude that the case must be reversed and remanded for a new trial on account of the

---

*Assigned by the Chairperson of the Judicial Council.

[1]Article I, section 16 of the California Constitution declares in relevant part that: ''Trial by jury is an inviolate right and shall be secured to all . . . .''

prosecution's improper use of peremptory challenges, we need not discuss other defense contentions.

■ In the case of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (referred to hereafter as *Wheeler*), our high court concluded that, "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. This does not mean that the members of such a group are immune from peremptory challenges: individual members thereof may still be struck on grounds of specific bias, as defined herein. Nor does it mean that a party will be entitled to a petit jury that proportionately represents every group in the community: we adhere to the long-settled rule that no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed is composed of any particular individuals. [Citations.]

"What it does mean, however, is that a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits." (22 Cal.3d, at pp. 276-277.)

Section 1069 of the Penal Code defines a peremptory challenge as "an objection to a juror for which no reason need be given . . . ." The *Wheeler* majority adopted the presumption that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground and declared that presumption to be rebuttable. (22 Cal.3d, at p. 278.)

■ In fashioning a remedy, the court stated that the objecting party "must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (22 Cal.3d, at p. 280, fn. omitted.)

The trial judge must determine, based upon the showing made by objecting counsel and the court's observations of the voir dire process, whether a prima facie case of group bias has been made out. In making that determination the court "must determine whether a reasonable

inference arises that peremptory challenges are being used on the ground of group bias alone.'' (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 281.) ''If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone.'' (*Ibid.,* fn. omitted.)

In the *Wheeler* case the prosecution apparently[2] used seven peremptory challenges to excuse black jurors called to the jury box in a case in which there were two black defendants accused of the murder of a white grocery store owner in the course of a robbery. When defense counsel moved for a mistrial, the court asked the prosecutor whether there would be a response but also indicated that he was not required to respond. There was no response and the court denied the motion for mistrial without comment. So far as appears, the case was tried before an all white jury. Our high court reversed the judgment ostensibly because the trial judge assumed that the defendant had no rights he could assert respecting the use of peremptory challenges in that case.

*People* v. *Johnson* (1978) 22 Cal.3d 296 [148 Cal.Rptr. 915, 583 P.2d 774], is a companion case to *Wheeler* which was decided on the same day. In *Johnson,* the defendant was a black male charged with the rape of a white female. During voir dire defense counsel stated that the prosecutor had used a peremptory challenge against one of only two black jurors and that he would object to the use of another such challenge against the other black juror.

The prosecutor admitted he intended to use his peremptory challenges '' 'As long as I have the ability on any black juror that is called to sit in this case.' '' (*People* v. *Johnson, supra,* 22 Cal.3d at p. 298.) He stated certain of his witnesses made racially prejudicial statements [nigger] that might be disclosed to the jury, '' 'which I would think would make it very difficult for any black person to be totally objective about it . . . either consciously or subconsciously . . . .' '' (*Id.,* at p. 299.)

After the jury was sworn, defendant moved for a mistrial on the peremptory challenge grounds set forth in Wheeler. After hearing the prosecutor expand upon his earlier comments, the court denied the motion without comment and the case was heard before an all white jury. Our high court reversed because the prosecutor's reasons were ''insufficient as a matter of law.'' (*People* v. *Johnson, supra,* 22 Cal.3d, at p. 299.)

---

[2]Defense counsel didn't spread on the record the racial identity of any juror until after the prosecution had peremptorily challenged eight sitting jurors.

In *People* v. *Allen* (1979) 23 Cal.3d 286 [152 Cal.Rptr. 454, 590 P.2d 30], two black defendants were convicted of aggravated assault by a life prisoner (Pen. Code, § 4500) and were sentenced to death. The victim was a white state correctional officer who had been stabbed to death. The prosecutor, over defense objections, used 14 peremptory challenges against 11 black potential regular jurors passed for cause and seated in the jury box plus three black potential alternate jurors passed for cause.

In response to defense objections, the prosecutor simply stated that because defense counsel had not demonstrated that the district attorney's office had routinely utilized peremptory challenges to exclude blacks from juries over a substantial period of time, the defendants had not made out a prima facie case of unconstitutional action and no explanation was necessary.[3]

The defendant's motion was denied and the case was tried before an all white jury. Our high court reversed on the basis that on the record before the trial court, a prima facie case was made and the court erred in not requiring the prosecutor to rebut that showing. (*People* v. *Allen, supra,* 232 Cal.3d, at p. 294.)

In *People* v. *Rousseau* (1982) 129 Cal.App.3d 526 [179 Cal.Rptr. 892], the prosecutor used two peremptory challenges against the only two black jurors on the panel. The race of the defendant was not shown in that decision wherein the charges were two counts of grand theft (Pen. Code, §§ 484, 487); conspiracy to commit theft (Pen. Code, § 182, subd. 4); and a failure to remit unemployment taxes (Rev. & Tax. Code, § 19408). "The prosecution . . . exercised two peremptory challenges against black jurors. The trial court took judicial notice that these jurors were the only blacks on the panel." (*Id.,* at p. 536.) The court's opinion disclosed that Rousseau's showing consisted solely of defense counsel's statement that the excused black jurors were the only two blacks on the whole panel. On that showing, the court determined that the statement did not constitute a prima facie showing.

Hence, in *Wheeler, Johnson* and *Allen,* our high court found that a prima facie case of group bias had been made out as a matter of law and that, in each case, the trial judge erred in overruling the defense

---

[3]The prosecutor was apparently relying upon concepts derived from *Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824]. (See, for example, *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664].)

objections. Only in the Court of Appeal decision in Rousseau did the objecting defense counsel fail to make a sufficient showing.[4]

In the instant case, the trial judge invited and heard the prosecutor's response to defendant's objections on two separate occasions, thus suggesting that perhaps the burden had shifted and the constitutional inquiry was in its second phase. However, in finally denying defendant's mistrial motion, the court clearly found that a prima facie case had not been established. We are thus presented with the question whether the court's failure to find a prima facie case had been established constituted reversible error.

In view of the procedural importance of the *Wheeler* case, we evaluate in detail some of its underlying rationale and distinguish it from certain other concepts.

The *Wheeler* rationale seems not to be the same as that basic to a host of well known "civil rights" or "affirmative action" legislation and judicial decisions. For example, it does not proceed under a traditional federal or state equal protection or due process analysis providing protection to persons historically subject to discrimination on account of such factors as race, sex, national origin and religion. It does not require or utilize the civil rights dogma of "a pattern of systematic exclusion or discrimination" resulting from federal or state "action." It does not require "standing" as a member of the excluded groups or as a group of persons denied equal opportunities. Nor is it limited by Sixth Amendment concepts arising from federal and state court decisions following *Swain v. Alabama, supra,* 380 U.S. 202. Its focus apparently is not merely upon discrimination or a history of "systematic exclusion" or protecting defendants' rights. It is equally available to the prosecution as well as to the defense.

Speaking for our Supreme Court, Justice Mosk stated: "In a series of decisions beginning almost four decades ago the United States Supreme Court has held that an essential prerequisite to an impartial jury is that it be drawn from *'a representative cross-section of the community.'* The rationale of these decisions, often unstated, is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age,

---

[4]But see generally *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 860 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Mooring* (1982) 129 Cal.App.3d 453, 458 [181 Cal.Rptr. 71]. Compare, *People* v. *Buford* (1982) 132 Cal.App.3d 288 [182 Cal.Rptr. 904], hearing denied August 25, 1982.

education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (*People* v. *Wheeler, supra,* 22 Cal.3d, at pp. 266-267, fns. omitted.)

The opinion in *Wheeler* analyzed federal[5] and state decisions following the representative cross-section rule in service of "other essential functions in our society, such as legitimating the judgments of the courts, promoting citizen participation in government, and preventing further stigmatizing of minority groups." (22 Cal.3d, at p. 267, fn. 6.)

---

[5]*Smith* v. *Texas* (1940) 311 U.S. 128 [85 L.Ed. 84, 61 S.Ct. 164] [blacks], wherein Justice Black wrote for a unanimous court in language that has proved to be seminal: "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." (*Id.,* at p. 130 [85 L.Ed. at p. 86]; *People* v. *Wheeler, supra,* 22 Cal.3d, at p. 267.) (*Glasser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457] [women-male defendants object].) The court wrote, quoting from *Smith* v. *Texas,* " 'the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a "body truly representative of the community," and not the organ of any special group or class.' " (22 Cal.3d at p. 267.)

In *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412] [daily wage earners], the court declared, "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. [Citations.]" (*Id.,* at p. 220 [90 L.Ed. at p. 1185]; *People* v. *Wheeler, supra,* at p. 268.)

In *Ballard* v. *United States* (1946) 329 U.S. 187 [91 L.Ed. 181, 67 S.Ct. 261] [women], the court quoted from *Thiel* and addressed the prosecution's contention that women do not "act as a class" by adding, "the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables." (*Id.,* at pp. 193-194 [91 L.Ed. at p. 186], fn. omitted.) "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal, reflected in the processes of our courts." (*Id.,* at p. 195 [91 L.Ed. at p. 187]; *People* v. *Wheeler, supra,* at pp. 268-269.)

*Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163] [blacks excluded—white defendant objects.] In rejecting the prosecution claim that the white defendant could not be harmed by the exclusion of blacks, the court stated, "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." (*Id.,* at pp. 503-504 [33 L.Ed.2d at p. 94]; *People* v. *Wheeler, supra,* at p. 269.)

In 1975, the United States Supreme Court, after reviewing federal decisions (see fn. 5), reversed a state conviction of a male defendant by a jury from which women had, in effect, been excluded and for the first time held the representative cross-section rule applicable to the states through the Sixth Amendment right to a jury trial. (*Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692].)[6] "The unmistakable import of this Court's opinions, at least since 1940, *Smith* v. *Texas, supra,* and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." (*Id.,* at p. 528 [42 L.Ed.2d at p. 697].) As among the functions of the representative cross-section rule the court concluded that, "The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. [Citation.] This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." (*Id.,* at p. 530 [42 L.Ed.2d at p. 698]; *People* v. *Wheeler, supra,* 22 Cal.3d at pp. 269-270.)

As *Wheeler* observed, our court recognized and applied the representative cross-section rule 21 years *before* the *Taylor* decision in *People* v. *White* (1954) 43 Cal. 2d 740 [278 P.2d 9]. The defendant in *White* failed to establish that the error complained of was prejudicial (exclusion of working people and inclusion of businessmen and club women) but the court found that the list the jury commissioner used was "improperly weighted so as to prevent having a good cross-section of the community for prospective jurors." (*Id.,* at p. 750.)

" 'The American system requires an impartial jury drawn from a cross-section of the entire community and recognition must be given to the fact that eligible jurors are to be found in every stratum of society. In selecting a truly representative jury panel, the membership lists of various clubs and organizations may be properly used, but they should

---

[6]See *People* v. *Wheeler, supra,* 22 Cal.3d, at page 270, footnote 8, wherein Justice Mosk treated the various concepts with respect to which the representative cross-section rule was enunciated.

not be relied on as the principle source of prospective jurors nor should they be used to the complete exclusion of other general sources more likely to represent a cross-section of the population, such as telephone directories, voting lists, and city directories. Any system or method of jury selection which fails to adhere to these democratic fundamentals, which is not designed to encompass a cross-section of the community or which seeks to favor limited social or economic classes, is not in keeping with the American tradition and will not be condoned by this court.' (See also *People* v. *Carter* (1961) 56 Cal.2d 549, 568-570 [15 Cal.Rptr. 645, 364 P.2d 477].)'' (*People* v. *Wheeler, supra,* 22 Cal.3d, at pp. 271-272; cf. *Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 59-60 [115 Cal.Rptr. 247, 524 P.2d 375]; *People* v. *Jones* (1973) 9 Cal.3d 546, 556 [108 Cal.Rptr. 345, 510 P.2d]; *People* v. *Hines* (1939) 12 Cal.2d 535, 539 [86 P.2d 92].)

■ The *Wheeler* court concluded, ''Accordingly, we now make explicit what was implicit in *White,* and hold that in this state the right to trial by a jury drawn from a representative cross-section of the section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution and by article I, section 16, of the California Constitution. [The express holding of the case, however, is founded upon the California Constitution.]

''It therefore becomes the responsibility of our courts to insure that this guarantee not be reduced to a hollow form of words, but remain a vital and effective safeguard of the liberties of California citizens.'' (*People* v. *Wheeler, supra,* 22 Cal.3d , at p. 272.)

■ ''[T]he law recogizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror *partiality.* The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative.'' (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 275; italics added.) The term ''partiality'' is more inclusive than either the ''actual bias'' or ''implied bias'' authorized as statutory grounds for challenge. (Penal Code, §§ 1073, 1074, 1076.) The *Wheeler* court insists that upon proper foundation, an attorney (prosecutor or defense counsel) may be compelled to disclose reasons for exercising certain challenges so that the court may determine whether presumably constitutional challenges, for whatever asserted reasons, in fact, have not been made improperly for the purpose of group bias.

We now turn to the facts in the instant appeal and undertake to evaluate them in the light of applicable principles. Fuller is black as is the

victim, Diana, in this sex case involving a charge of assault with intent to commit rape. All three of the black prospective jurors in the entire venire were excused pursuant to the prosecutor's peremptory challenges. There is no dispute in the briefs or arguments as to whether defendant first, through timely objection,[7] made a complete a record of the circumstances as is feasible and second, established that the peremptorily challenged jurors—the subject of defendant's objection—were members of a cognizable group within the meaning of the representative cross-section rule.[8] Accordingly, we may focus solely upon the third element of the prima facie case: whether from all the circumstances of the case he showed a strong likelihood that such persons were being challenged because of their group association rather than because of any specific bias. (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 280.)

■ The *Wheeler* court for illustrative purposes, set forth certain means by which one might show his opponent has challenged jurors because of a group bias: Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole.[*] Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all.'' (*People* v. *Wheeler, supra,* 22 Cal.3d, at pp. 280-281.)

''Upon presentation of this and similar evidence—in the absence, of course, of the jury—the court must determine *whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone.* . . .

''If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone.'' (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 281, italics added, fn. omitted.)

■ When the statutory provision that ''no reason need be given'' for a peremptory challenge (Pen. Code, § 1069) comes into conflict with

---

[7]After the prosecutor challenged the second black juror, defendant asked for a conference and the court expressly reserved defendant's right to preserve his record.

[8]Blacks have in similar circumstances long been held to be a cognizable group.

*''For example, in a case of alleged exclusion on the ground of race it may be significant if the persons challenged, although all black, include both men and women and are of a variety of ages, occupations and social or economic conditions.''

the constitutional right to an impartial jury and the representative cross-section rule, the statute "must give way to the constitutional imperative: the statute is not invalid on its face, but in these limited circumstances it would be invalid as applied if it were to insulate from inquiry a presumptive denial of the right to an impartial jury. [¶] That right is paramount because the peremptory challenge is not a constitutional necessity but a statutory privilege." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 281, fn. 28; also see *People* v. *King* (1966) 240 Cal.App.2d 389, 399-400 [49 Cal.Rptr. 562, 21 A.L.R.3d 706], wherein Presiding Justice Sullivan established peremptory challenges have no federal or state constitutional origins.)[9]

The three black jurors peremptorily challenged by the prosecution were his second (Mrs. T), fifth (Mrs. P), and ninth (Mr. R) peremptory challenges. Mrs. T, an Oakland resident for 14 years, was a married Richmond school teacher of third and fourth grade children. She had taught in the Oakland-Richmond School District for 13 years. Her husband was employed in the Oakland post office. She was a mother of two female children, aged 13 and 19. The older was a student at San Francisco State.

Mrs. P, a Hayward resident, was for 4½ years a psychiatric technician at St. Mary's Hospital in San Francisco who counselled adolescents between the ages of 12 and 18. Some were assaultive. Her training included secretarial, medical and counselling work. She had earlier been a counselor in Chicago. As counselor, she saw 20 or 30 people daily, some in custody or on custody holds. She was married to an insurance company underwriter and has 2 daughters, 12 years and 18 months old.

Mr. R, an Oakland resident, was a married General Motors employee. He had an eight-month-old daughter. He had lived in the Bay Area for about 23 years. His wife was a data processor for the Clorox Company. He read the Oakland Tribune, San Francisco Chronicle, Sports Illustrated, Jet and Ebony and played basketball through the Oakland Recreation Department with Berkeley, Fresno and San Jose policemen. He worked at General Motors for seven and one-half years as an assembler. He was laid off for a year and a half and thereafter returned to work there in November. His voir dire took place on February 4, 1981, after he had been back to work for two or three months. He was the only prospective juror who the prosecutor asked whether he would

---

[9]Query whether they were part of the common law of California as adopted from England since the Crown's right to peremptory challenges was abolished in England in 1305. (33 Edw. 1 C. 2 [1305], Halsbury's Laws of England, vol. 26, par. 624 (4th ed. 1979).)

have any feelings for or against the victim "just knowing she is a young black woman."

No objection was made when the district attorney challenged Mrs. T. However, after the challenge of Mrs. P, defense counsel requested an opportunity to step into chambers for a brief discussion which occurred later in the record before us. Fifty voir dire transcript pages later, the prosecutor challenged Mr. R peremptorily. Defendant moved for a mistrial and asked for a new jury based on the exclusion of all three black jurors in the panel. The court asked the prosecutor for a response.

The prosecutor responded by contending that of the black potential jurors excused two were female and only the last was male and that defense counsel challenged four white women and thus systematically tried to exclude white women from the jury, excluding only two white males. He also denied his challenges established "a strong likelihood that the persons I have challenged are because of group association rather than any specific bias on my part." The court denied the motion and said, "I do not see any systematic exclusion. I see his exercising eight challenges, five of them Caucasians and three of them Negro."

In the afternoon of the following day, after the jury was sworn and excused, and by prearrangement with the court who allowed the procedure, defense counsel both orally and through a typed memorandum renewed his *Wheeler* motion and requested a mistrial in reliance upon *Wheeler* and *Johnson*. The transcript discloses what then occurred.[10]

---

[10]"THE COURT: Mr. Smith? [¶] MR. SMITH (Deputy District Attorney): Yes, Your Honor. I would supplement the record in some regard from yesterday and the previous motion. As the Court knows, in the Wheeler case, the higher court defers to the local courts in that they are here and seated and can observe what is happening. [¶] The court does point out in the Wheeler case that the court and the moving party in the Wheeler motion also must look to the totality and the circumstances of the case itself that is before the court and not just the reality of the group that is being excluded. [¶] The point of the test is the circumstances of the case. Additionally, the court says that the local court, before requiring the District Attorney to offer to the court his reasons for excluding the jurors, the court must find there is a reasonable inference that peremptory challenges are being used on the grounds of group bias alone, and the local court must also select and distinguish true discrimination on the part of those challenges and on the part of a motion from the moving party distinguishing from this claim interposed for purposes of harassment or delay in the case. [¶] I would point out, and I don't believe we did point out in the record yesterday, that in this particular case, it is true that the defendant is of the black race. However, the victim and all percipient witnesses in this case are black. If there are any white witnesses to be called at all, it would be my belief they would probably be defense witnesses and probably police officers who are not percipient to the offense. [¶] That is one concern that the court addressed in the Wheeler case. It would seem to me, and it is my belief that there are no racial overtones in this case whatsoever. It is not a case that would, on its face, and from my knowledge of the case, have any prejudice in it and, in fact, the issue on jury selection would seem to be more of

Evidently, in inviting a response, the court merely intended, as a traditional courtesy, that the prosecutor have the usual opprtunity to be heard in opposition to his opponent's contentions.[11] The district attorney's responses never touched upon the critical question of specific bias.

In recognition of the significance of the trial court's observations in this area, the *Wheeler* court stated, "We recognize that such a [prima facie] ruling 'requires trial judges to make difficult and often close judgements. They are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' (Kuhn, [*Jury Discrimination: The Next Phase* (1968) 41 So.Cal.L.Rev.] *op.cit. supra*, fn. 5 at p. 295.) They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay." (22 Cal.3d, at p. 281.)

The district attorney contended (but it is not urged by the Attorney General in the appeal) that the defendant peremptorily challenged five white women. By analogy, the following statement by Justice Mosk would seem to apply: "A party does not sustain his burden of justification by attempting to cast a different burden on his opponent." (*People* v. *Wheeler, supra*, 22 Cal.3d, at p. 283, fn. 30.)

---

concerned women for another woman who was assaulted. [¶] In that regard, as I pointed out yesterday, Mr. Powell excused white women and, in fact, now there has been excluded five white women, and it would seem that that is a more definable group, both in number and type of people. [¶] I excluded five men and five women. I think his group is more recognizable from the standpoint of numbers and from the type of people they are. [¶] THE COURT: Your response, Mr. Powell? [¶] MR. POWELL (Assistant Public Defender): Yes. I move to strike his comments having to do with any challenges exercised by the defendant. [¶] They are totally irrelevant to the Court's consideration and irrelevant to any legal decisions that I am aware of in this state regarding the particular issues here. [¶] THE COURT: The matter is submitted. [¶] Pursuant to Wheeler it is now the Court's responsibility to determine whether a reasonable inference arises that peremptory challenges are being used on the grounds of group bias alone, and it is the Court's determination that such a reasonable inference has not arisen in this proceeding. [¶] A number of different inferences can be drawn, but I don't believe a reasonable inference has arisen that peremptory challenges are being used on the grounds of group bias alone. [¶] Accordingly, the motion for mistrial is denied."

[11] We conclude, as we said earlier, that despite certain murkiness in the record, the court believed the burden did not shift to the prosecution to show that the peremptory challenges were not predicated on group bias. (*People* v. *Wheeler, supra*, 22 Cal.3d, at p. 281.)

The prosecutor's statement that his peremptory challenges involved two females but only one male, appears to be a contention more favorable to the defendant's position for, "in a case of alleged exclusion on the ground of race it may be significant if the persons challenged, although all black, include both men and women and are of a variety of ages, occupations, and social or economic conditions." (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 280, fn. 27.)

As we earlier indicated, the district attorney argued at trial that there were no racial overtones in his case because the black defendant's victim was not white but was instead black. The same contention is footnoted in the Attorney General's brief. Both contentions result from what may be a misreading of *Wheeler.*[12] Since the representative cross-section rule does not even require that the defendant and the excluded jurors be of the same group, a fortiori, it would seem there can be no requirement that the victim be white, or of a majority group or of any particular other group.[13] It is *not essential* that there be "group overtones." The *Wheeler* court made reference to the point simply to illustrate, as applied to the instant case, that if a defendant is black and the victim is white such facts would be *especially significant in the totality of circumstances* in establishing group bias.

As it is, before the mistrial motion was denied, the record disclosed significant "race factors." To begin with, the black male defendant is charged with assault with intent to commit rape and the trial jury was all white.[14] The district attorney stated that all of his witnesses were black. From the pretrial motions, it was evident that the defense would be misidentification with its usual accompanying alibi. In such circumstances, it is not unusual for the defendant to testify (unless inhibited by impeachment priors) backed up by relatives, neighbors or

---

[12]In illustratively listing a "compendium" of relevant ways in which a prima facie case may be made, and supplementing those with the significance of desultory questioning of the excluded jurors, the court stated, lastly, *if* the defendant happens to be a member of the excluded group, that fact may also be called to the court's attention "*and especially if in addition* his alleged victim is a member of the group to which the majority of the remaining jurors belong . . . ." (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 281, italics added.)

[13]As earlier noted, a "defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule . . . ." (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 281.)

[14]The record does not disclose the presence, number or group identification of the jurors as other than nonblack. We must therefore assume they were all white rather than some combination of whites and nonwhites. No party or counsel contends any one of them was black.

acquaintances.[15] It could reasonably have been inferred in the instant case that among those witnesses some, if not all, would be black. Such factors as have been discussed in the foregoing analysis are among the circumstances open to trial judge evaluation under *Wheeler*.[16]

It is also urged that the district attorney's voir dire of the black jurors was not any more desultory than that of the other nonblack jurors who were peremptorily challenged. Once again, we observe that it is *not essential* that the objecting party prove desultory questioning. Desultory questioning, apparently, merely supplements the showing the objecting party seeks to make under the third prong of the *Wheeler* prima facie test that from all the circumstances of the case, jurors were excluded on the basis of group bias rather than specific bias.[17] In a close case, such an additional consideration could be *helpful* to the trial judge.

Of further significance is the fact that the *Wheeler* opinion does not suggest that the conclusion of desultory questioning arises from a comparison confined to the group of jurors excused by the prosecutor or even to all the jurors examined by the district attorney. The record discloses that of the three black jurors, the district attorney's voir dire of Mrs. T consisted of two pages; of Mrs. P, four pages and of Mr. R, two pages. For the most part the questions asked were standard and routine. The answers provided failed to show that any of the three jurors was reasonably likely to be specifically biased against the prosecution. Instead, except for sharing one single characteristic, their race, they were "in all other respects . . . as heterogeneous as the community as a whole." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 280.) Indeed, all three of the jurors were married, employed and had at least one daughter. (See *ante,* at p. 416.) Probing questions, to elicit specific bias, were not asked. In our view the questioning was desultory.

The prosecution called to our attention that Mrs. P worked with adolescents, some of whom were in custody and some involved in assault-type crimes. It is also emphasized that Mr. R had suffered a previous period of unemployment. The specific contentions are that the district attorney *might* have concluded that Mrs. P "may have formed a bias against the system (and its representatives)" and that Mr. R, as the

---

[15]Fuller admitted a charged state prison prior rape and a one year enhancing parole violation on account of the instant offense with which he could not be impeached in this trial once admitted by him. (See *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1].)

[16]Naturally, our review is limited to what the record showed plus reasonable inferences at the time of the decision on the *Wheeler* motion.

[17]*People* v. *Wheeler, supra,* 22 Cal.3d at page 280.

district attorney said, *might* "suffer the most financial hardships from a long trial and consequently, might not be fully attentive." We are not obligated to engage in such speculation.[18] Still, the risk of inattention is not the proper basis for a peremptory challenge. "The purpose of the challenges also dictates their scope: they are to be used to remove jurors who are believed to entertain *a specific bias, and no others.*" (*People* v. *Wheeler, supra,* 22 Cal.3d, at p. 274, italics added.) And the posttrial hypothesized suggestion regarding possible bias for the defendant in Mrs. P, in view of her voir dire, is countered by the equally valid possibility of bias for the prosecution.

But even if it were to be assumed arguendo that Mrs. P and Mr. R might properly have been excused through the exercise of a peremptory challenge, there remains for consideration challenged juror Mrs. T. The Attorney General does not seek to justify in any fashion the challenge against her. As indicated earlier,[19] she was a teacher with 13- and 19-year-old daughters. The two-page voir dire of her by the district attorney contained neither an answer evidencing specific bias nor even any question from the prosecutor inviting speculation as to the existence of specific bias. It is stated in *Wheeler* that: "If the court finds that the burden of justification is not sustained as to *any* of the questioned peremptory challenges, the presumption of their validity is rebutted." (22 Cal.3d, at p. 282, italics added.) This rule, as applicable to any challenged juror, is stated in *Wheeler* with reference to the second stage wherein the court has already found a prima facie case to have been established. Logically, it would seem to apply to the first stage [prima facie stage] in order for the second stage [justification stage] rule to have any validity.

With respect to the foregoing contentions made by the Attorney General in seeking to justify two peremptory challenges, we note initially that *Wheeler* criticized as "virtually impossible" the burden of proof [historic pattern of discrimination] imposed on criminal defendants by *Swain* v. *Alabama, supra,* 380 U.S. 202, and the federal and California decisions following it: "It demeans the Constitution to declare a fundamental personal right under the charter and at the same time make it virtually impossible for an aggrieved citizen to exercise that right. For the reasons stated, the rule of *Swain* v. *Alabama* is not to be followed in

---

[18]Here, as in *Wheeler,* the prosecutor declined to give any reason. It is true that in *Wheeler* the court affirmed the prosecutor's "right" not to give a reason. In the instant case the district attorney was never asked to give a reason. When he did respond, he at no time gave a reason for suspecting partiality or specific bias. "Because the prosecutor declined to give any such reason, we shall not speculate on whether he could have done so." (*Wheeler, supra,* 22 Cal.3d 258, fn. 30 at p. 283.)

[19]*Ante* at page 416.

our courts and the cases applying it are disapproved to that extent.'' (22 Cal.3d, at p. 287.) Also, ''[i]t would be unrealistic and contrary to applicable principles . . . to impose upon a defendant the burden of excluding all possible and permissible explanations for underrepresentation. (*Duren* v. *Missouri, supra,* 439 U.S. at pp. 368-369 [58 L.Ed.2d at pp. 589-590]; *People* v. *Wheeler, supra,* 22 Cal.3d at pp. 286-287.)'' (*People* v. *Buford, supra,* 132 Cal.App.3d 288, 297.)

The Attorney General urges that the instant case is controlled by the *Rousseau* case rather than the *Wheeler, Johnson* and *Allen* cases.[20] We disagree. In *Rousseau,* ''appellant's attempt to satisfy the required *prima facie* case was limited to his statement that 'there were only two blacks on the whole panel, and they were both challenged by the district attorney.' ''[21] Obviously, such a statement alone is insufficient. Thus, *Rousseau* is distinguishable as a case in which the defendant failed to make a sufficient showing even as to the first rung under *Wheeler* that the defendant must promptly ''make as complete a record of the circumstances as is feasible.''[22] In the instant case, as we have shown, no question is raised as to defendant's having made a sufficient showing under *Wheeler*'s first and second rungs. It is only the third rung with which we are concerned. *Wheeler* controls here. The failure of the prosecutor in the instant case to volunteer any reasons is, in practical effect, analogous to the *Wheeler* prosecutor's refusal to give any reason.

Since the prosecutor did not seek to show his challenges were based upon specific bias, we examine the comments of the trial judge. When the court concluded that no prima facie case existed, it stated that a reasonable inference that peremptory challenges were being used on the grounds of group bias alone had not arisen. The court then stated, ''*A number of different inferences can be drawn,* but I don't believe a reasonable inference has arisen that peremptory challenges are being used on the grounds of group bias alone. [¶] Accordingly, the motion for mistrial is denied.'' (Italics added.) The court is not required to state the reason for its finding; and, in this case, the court did not do so. No doubt the trial court made observations which aided it in its finding; but neither these observations nor any bases for, or comments about, them appear in the record before us.

In *Wheeler,* the court stated that the complaining party, ''from all the circumstances of the case . . . must show a strong likelihood that such

---

[20]*People* v. *Wheeler, supra,* 22 Cal.3d 258; *People* v. *Johnson, supra,* 22 Cal.3d 296; *People* v. *Allen, supra,* 23 Cal.3d 286.

[21]*People* v. *Rousseau* (1982) 129 Cal.App.3d 526, 536 [179 Cal.Rptr. 892].

[22]*People* v. *Wheeler, supra,* 22 Cal.3d, at page 280.

persons are being challenged because of their group association rather than because of any specific bias."[23] Within a page of that quotation, it was said, "the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone."[24]

We believe that a fair reading of *Wheeler* requires only that the court find a reasonable inference of group bias once an appropriate foundation is laid in the first of the two stages.[25]

■ We find no "independent ground" for the challenges in the entire record of this proceeding. Hence, we conclude that on the record in the instant case, Fuller made a more than sufficient showing of a prima facie case. He (1) objected promptly and made the best record possible; (2) showed that the excluded jurors were of a cognizable group; and (3) established from all the circumstances that there arose a reasonable inference of group bias rather than specific bias. In the absence of sufficient evidence as a matter of law to support the trial court finding in this case, we determine that it was error not to require the prosecutor to respond to the allegation and to deny appellant's motion for mistrial without a rebuttal showing by the prosecutor that each challenge was predicated on grounds of specific bias. The error is prejudicial per se under *Wheeler*.

Accordingly, we must reverse the judgment and remand the cause for a new trial. In view of our disposition of the peremptory challenge issue

---

[23] 22 Cal.3d, at page 280.

[24] 22 Cal.3d, at page 281.

[25] For example, the word "alone" in the second quoted phrase logically must be interpreted consistently with the phrase in the first quotation, "rather than because of any specific bias." Otherwise the Supreme Court must be deemed to have required in one place the complaining party to make a showing which is different from that, the existence of which, the trial court must determine in another. Thus, properly viewed, the trial court must determine under the third *Wheeler* rung whether "persons are being challenged because of their group association rather than because of any specific bias" which is, and must be, identical to "whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone." We are unwilling to believe that our high court intended to create different options for trial judges within one page of each other in so carefully crafted an opinion as the *Wheeler* opinion. Moreover, the phrase "reasonable inference" is more familiar to bench and bar than "strong likelihood." E.g., "The court must determine whether *a reasonable inference arises* . . . ." (22 Cal.3d, at p. 281.)

A Massachusetts high court decision which follows the *Wheeler* rule, based upon a state constitutional provision, requires only a showing of "a likelihood." (*Com.* v. *Soares* (1979) 377 Mass. 461 [387 N.E.2d 499, 517]. See Note, *The Defendant's Right to Object to Prosecutorial Misuse of the Peremptory Challenge* (1979) 92 Harv.L.Rev. 1770.)

and our belief that the remaining issues are unlikely to recur, we do not discuss them.

We are mindful that the *Wheeler* opinion may have significantly altered the usual voir dire practices of the bench and bar before that decision. ■ ■ ■ ■ And, it may not be a palliative that in *Wheeler* our high court expressly did not reach the question of the applicability of its rules to civil cases or state that criminal cases, of course, involve public trials in which the prosecutor represents the state and has a high duty, actually and in appearance, to seek justice, not merely convictions.[26] Nevertheless, we, of course, are obliged to follow the procedure of the *Wheeler* case as a binding precedent. (*Auto Equity Sales, Inc. .v. Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)

The judgment is reversed.

Racanelli, P. J., concurred.

**ELKINGTON, J.**—I respectfully dissent.

Relying on *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], *People* v. *Johnson* (1978) 22 Cal.3d 296 [148 Cal.Rptr. 915, 583 P.2d 774], and *People* v. *Allen* (1979) 23 Cal.3d 286 [152 Cal.Rptr. 454, 590 P.2d 30], my esteemed colleagues have, I believe, given those authorities a meaning clearly unintended by their authors. Further, as foreseen by the Chief Justice in her qualified concurrence in *Wheeler* (22 Cal.3d p. 287), in their attempt to stop a vicious unconstitutional practice they have overreacted, and abridged, perhaps destroyed, the peremptory jury challenge which has come to us ''from the common law with the trial by jury itself, and has always been held essential to the fairness of trial by jury.'' (*Lewis* v. *United States* (1892) 146 U.S. 370, 376 [36 L.Ed. 1011, 1014, 13 S.Ct. 136].)

---

[26]It is the obligation of the prosecution, as well as of the court, to respect the mandate that a fair and impartial trial is a fundamental aspect of the right of accused persons not to be deprived of liberty without due process of law. (*Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629]; *People* v. *Lyons* (1956) 47 Cal.2d 311, 318, 319 [303 P.2d 329].) ''Nor is the role of the prosecutor in this regard simply a specialized version of the duty of any attorney not to overstep the bounds of permissible advocacy. . . . In all his activities, his duties are conditioned by the fact that he 'is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'' (*People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164].)

"Although '[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges,' . . . nonetheless the challenge is 'one of the most important of the rights secured to the accused,' . . . The denial or impairment of the right is reversible error without a showing of prejudice, . . . . 'For it is, as Blackstone says, an arbitrary and capricious right, and it must be exercised with full freedom, or it fails of its full purpose.' . . . [¶] The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. . . . [T]he view in this country has been that the system should guarantee *not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.*'" (*Swain* v. *Alabama* (1965) 380 U.S. 202, 219-220 [13 L.Ed.2d 759, 772, 85 S.Ct. 824]; italics added.)

*Wheeler, Johnson,* and *Allen,* as pointed out by my colleagues, concerned conflicts between the defendants' "right to trial by an impartial jury guaranteed by the California Constitution," and the lesser but nevertheless "important right" long assured to both parties of a criminal action. By *Wheeler, Johnson,* and *Allen,* the state's high court resolved the issue by "evenly holding the scales."

Facing the problem in *Wheeler* (which must reasonably be deemed the leading case), and stating—"we do not underestimate its difficulty"—the high court announced the apposite rules, upon a charge by a party that his opponent is "using his peremptory challenges to strike jurors on the ground of group bias alone."

The rules, as pertinent here, follow:

(1) The person so charging must show, "from all the circumstances of the case . . . a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (22 Cal.3d at p. 280.)

(2) "Upon presentation of this and similar evidence . . . the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone. . . ."

(3) "If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory

challenges in question were not predicated on group bias alone.'' (22 Cal.3d at p. 281.)

(4) ''If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted.'' (22 Cal.3d at p. 282.)

I believe my colleagues have erred in respect of the intent of the above rule numbered (2).

Following the pertinent evidentiary showing and argument of defendant Fuller, the trial court ruled as follows: ''The Court: The matter is submitted. [¶] Pursuant to *Wheeler, it is now the court's responsibility to determine whether a reasonable inference arises that peremptory challenges are being used on the grounds of group bias alone, and it is the court's determination that such a reasonable inference has not arisen in this proceeding.* [¶] A number of different inferences can be drawn, *but I don't believe a reasonable inference has arisen that peremptory challenges are being used on the grounds of group bias alone.* [¶] Accordingly, the motion for mistrial is denied.'' (Italics added.)

My colleagues say, as I read their opinion, that the trial court's (above unemphasized) clause, ''A number of different inferences can be drawn,'' constitutes the finding of a reasonable inference of ''group bias alone'' which, *although the court chose not to draw it,* under *Wheeler* shifted to the prosecution the burden of proving the absence of ''group bias alone.''

Thus, a novel procedure is about to be grafted upon our criminal law.

It does violence to the long existent rule of criminal and civil law that: ''When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.'' (*Grainger* v. *Antoyan* (1957) 48 Cal.2d 805, 807 [313 P.2d 848].)

No complaint is observed that the trial court's determination was not supported by substantial evidence. Indeed defendant Fuller concedes that ''the district attorney may have excused the three Blacks for constitutionally permissible grounds.''

There is a presumption that "a party exercising a peremptory challenge is doing so on a constitutionally permissible ground." (*Wheeler,* 22 Cal.3d p. 278.)

Moreover, we note that the trial court found only that "different inferences [not reasonable inferences] can be drawn." By no test of logic may such inferences, not found reasonable, apply under our law.

But more important, such a conclusion is squarely contrary to *Wheeler*'s command. On this subject that court said: "Upon presentation of [the defendant's] evidence—in the absence, of course, of the jury—the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone." (22 Cal.3d p. 281.) The language manifestly requires the *trial court's,* not our, determination of the applicable reasonable inference's existence.

Then, as a sort of emphasis to the point, the *Wheeler* court declared: "We recognize that such a ruling 'requires trial judges to make difficult and often close judgments. They are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' . . . They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay." (22 Cal.3d p. 281.)

I am accordingly of the opinion that it was not the trial court, but instead this court, which has misapplied *Wheeler* and its companion cases.

Although, as pointed out, no contention is made by Fuller that the trial court's criticized ruling was without substantial evidentiary support, it seems proper to briefly analyze the evidence vis-à-vis that of *Wheeler, Johnson,* and *Allen.*

In *Wheeler* the defendant was black and his claimed victim, white. The prosecutor's examination of some blacks was perfunctory and as to the others, no questions were asked at all; it was apparent that he proposed at the start to challenge all black members of the venire. *Johnson* also concerned a black defendant and white victim; and the prosecutor on the record stated: "As long as I had peremptory challenges I intended to

excuse black jurors in this case.'' In *Allen* also, the defendant was black and his alleged victim white. The white veniremen were questioned at length, and the blacks (14 in all) were simply asked ''if their answers would differ,'' and then excused.

In the case at bench, defendant Fuller, the alleged victim, and the prosecution's percipient witnesses were all black. The obvious purpose of such a claimed prosecutorial group bias did not exist. My colleagues find it ''*not essential* that the objecting party prove desultory questioning,'' but nevertheless state that in ''our view the questioning [of blacks] was desultory.'' I disagree; my reading of the record indicates the examination of the three blacks who were peremptorily excused (one man and two women) was at least as extensive and probing, as that of their white counterparts.

It is significant, and appropriate, to here point out that *Wheeler* expressly recognized and emphasized two relevant indicia of group bias: (1) the excessive peremptory challenges of members of the same race of the defendant but a different race from the complaining witness; and (2) the ''desultory questioning'' indicating no intent to impanel members of the minority race. Neither, it is respectfully opined, was present here.

There was patently substantial evidence, and reasonable inferences therefrom, supportive of the trial court's questioned ruling. Fuller agrees, by his above-noted appellate concession that ''the district attorney may have excused the three Blacks for constitutionally permissible grounds.'' This can mean only that such a ''reasonable inference'' might have been drawn by the trial court.

Should this court's opinion become the law of the state, a sort of inverse discrimination would, I think, result. For it would be a rare prosecutor who would jeopardize a verdict by exercising peremptory challenges against minority persons, lest as here a reviewing court, overruling the trial court, shall find an inference of group bias alone.

I would affirm the judgment.

A petition for a rehearing was denied November 5, 1982, and the opinion was modified to read as printed above. Elkington, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied December 1, 1982. Newman, J., and Broussard, J., did not participate therein.