[No. D018363. Fourth Dist., Div. One. Aug. 3, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JEMAL BERNARD, Defendant and Appellant.

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MILLER, J.*—**Jemal Bernard was convicted of one count each of first degree murder (Pen. Code,[1] § 187, subd. (a)), second degree robbery (§ 211), kidnapping (§ 207, subd. (a)), and fraudulent use of another's credit card (§ 484f, subd. (2)). With respect to the murder, the special circumstance of felony murder during the commission of a robbery (§ 190.2, subd. (a)(17)) was found by the jury to be true. With respect to the murder, robbery, and kidnapping, the jury found Bernard used a firearm (within the meaning of § 12022.5, subd. (a)) and with respect to the robbery and kidnapping, caused great bodily injury (within the meaning of § 12022.7).

Bernard was sentenced to a total term of 33 years, 8 months to life in prison without the possibility of parole. The trial court imposed the upper term of five years as to the second degree robbery count, stayed the term pursuant to section 654, but imposed three years for the great bodily injury enhancement on that count without any stay under section 654. On appeal, Bernard asserts trial court error in denial of *Wheeler*[2] motions, as well as instructional and sentencing error. We affirm the judgment but modify the sentence.

### FACTUAL BACKGROUND

#### A. *Prosecution Case*

On January 24, 1992, Bernard admittedly shot and killed James Brue on Green Valley Truck Trail in the Poway area of San Diego County, after having forced Brue at gunpoint to drive to that location. Thereafter, Bernard took Brue's credit cards to purchase goods.

Brue, 50 years old at the time of his death, was like an uncle to the Bugbee sisters, Cheyenne, Heather, and Ginger, who lived across the street from Brue for a period of years beginning in about 1986. Brue provided food, clothing, transportation and friendship to all three Bugbee sisters. This relationship continued even after the Bugbee girls moved from the neighborhood.

Specifically, Cheyenne Bugbee, 14 years old when she first met Brue in approximately 1986, considered her relationship with Brue to be one of

---

*Judge of the San Diego Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1] All statutory references are to the Penal Code.

[2] *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (hereafter *Wheeler*).

friendship or that of an uncle and niece. During the last six months of Brue's life he basically kept Cheyenne fed and clothed.

Cheyenne first met Bernard at about the same time she first met Brue. At that time Bernard became Cheyenne's boyfriend until early 1991.

Bernard was uncomfortable with the relationship Cheyenne had with Brue. On Friday, January 24, 1992, Bernard shot Brue with the gun of a friend, Leonard Volpe. Bernard saw his friend Myron Smith later the same day and told him the car he was driving was Brue's. During the evening of January 24, 1992, Bernard, Smith, and one other friend went to a shopping mall and bought goods with credit cards of Brue's. Bernard made purchases at the mall using Brue's credit card.

On January 25, 1992, Bernard told Volpe, with whom he had been living, he had beaten up a person who was a mile down the Green Valley Truck Trail, covered in plastic. Volpe then advised police of the location of Brue's body. In fact, Judith Castagna had seen a car run off the Green River Truck Trail on the morning of January 24, 1992. When she approached the vehicle, she saw Bernard who told her the car was his mother's. David Plott, a City of Poway park ranger also saw Bernard on the morning of January 24, 1992, at the entrance to the Green Valley Truck Trail. Bernard seemed nervous, stated his car was stuck by the side of the road, stated initially the car was his, and then stated it was his father's car.

Forensic pathologist Dr. Christopher Swalwell visited the crime scene on Green Valley Truck Trail while Brue's body was still present. The autopsy disclosed Brue sustained five gunshot wounds, one through the heart and lungs, and four to the back and shoulder area. Cause of death was multiple gunshot wounds.

Bernard was apprehended on January 31, 1992, after fleeing from police officers.

B. *Defense*

Bernard's defense consisted almost exclusively of his own testimony. He did not approve of Brue's relationship with Cheyenne, except for the 1988-1989 time period. Bernard expressed his dislike for Brue to Cheyenne and felt Brue was doing things for Cheyenne Bernard should have done.

Bernard was using drugs (crystal) in January 1992 and drank every day. On the morning of January 24, 1992, he was waiting at a bus stop on

Pomerado Road with beer and a gun he had taken from Volpe's house in a bag. He saw Brue stopped in his vehicle at a stoplight and gestured for him to pull over as Bernard wanted a ride to San Diego. Brue agreed to give him a ride.

Once in the car Bernard asked Brue whom Cheyenne was seeing and whether Brue was still seeing Cheyenne. Bernard became upset when Brue told him Cheyenne and someone named Chris Geiger were seeing each other. Bernard pulled out the gun and ordered Brue to drive him to Geiger's house. Then, Bernard ordered Brue to drive him to Poway. Brue complied because Bernard had pulled a gun on him. At that time Bernard was scared and wanted to take Brue to a location, leave, and take the car. At that time he did not intend to shoot Brue.

Bernard and Brue drove to the Green Valley Truck Trail. Bernard told Brue to stay away from Cheyenne. Brue said he would not and called Bernard a "nigger." At that point Bernard shot Brue, covered him with plastic, and started to drive away when he went off the road. Bernard took a credit card from Brue's wallet to pay for a tow truck driver. Bernard later used Brue's credit cards on a shopping spree at Parkway Plaza.

DISCUSSION

### A. *Denial of Wheeler Motions*

■■■ Bernard argues the trial court erred when it denied his motions brought under *Wheeler, supra,* which bars the use of peremptory challenges to remove prospective jurors based upon group bias. Bernard contends the trial court misconstrued the *Wheeler* guidelines for determining whether there had been an impermissible use of peremptory challenges to remove prospective jurors based on group bias. After examining the entire record on this point we conclude the trial court correctly applied the *Wheeler* standard and properly found no *Wheeler* violation.

■ The right to a trial by a jury drawn from a representative cross-section of the community is guaranteed by article I, section 16 of the California Constitution. The use of peremptory challenges to remove prospective jurors based on group bias violates this right. (*Wheeler, supra,* 22 Cal.3d at pp. 276-277; accord, *Batson* v. *Kentucky* (1986) 476 U.S. 79, 97 [90 L.Ed.2d 69, 88, 106 S.Ct. 1712].) The procedural protocol for determining whether a *Wheeler* violation has occurred is itself set forth in *Wheeler, supra,* 22 Cal. 3d at pages 280-282, and has been consistently applied by our Supreme Court: "If a party believes an opponent is improperly using peremptory challenges for a discriminatory purpose, that party must make a

timely objection and a prima facie showing that the jurors are being excluded on the basis of group bias. [Citation.] To establish a prima facie case, the moving party should first make as complete a record as possible; second, the moving party must establish that the persons excluded are members of a cognizable group; and third, the moving party must show a strong likelihood that the persons are being excluded because of group association. [Citations.] Once the moving party has established a prima facie case, the burden shifts to the other party to come forward with a race-neutral explanation related to the particular case to be tried. [Citations.]" (*People* v. *Fuentes* (1991) 54 Cal.3d 707, 714 [286 Cal.Rptr. 792, 818 P.2d 75].) It is then the trial court's obligation to consider all the evidence to determine whether there exists a *reasonable inference* peremptory challenges have been used on the ground of group bias alone. (*Wheeler, supra,* 22 Cal.3d at p. 281.)

Bernard contends the third prong of the *Wheeler* test for establishing a prima facie *Wheeler* violation, i.e., a showing of a *strong likelihood* of exclusion because of group association, has been reduced to a "reasonable inference" of improper prosecutorial exclusion of prospective jurors. Bernard cites *People* v. *Fuller* (1982) 136 Cal.App.3d 403, 423 [186 Cal.Rptr. 283] to support the contention. Although the *Fuller* court expressed doubt as to whether the Supreme Court in *Wheeler* in fact intended a threshold prima facie standard consisting of a "strong likelihood" in light of the ultimate "reasonable inference" test to be utilized by the trial court, we are convinced the Supreme Court intended the meaning of its carefully crafted language, which provides proper procedural guidelines for a trial court, and reject any dictum in *Fuller* to the contrary.

First, we must begin by recognizing there is a presumption a party exercising a peremptory challenge is doing so on constitutionally firm ground. (*Wheeler, supra,* 22 Cal.3d at p. 278.) At the threshold, such a basic presumption should be capable of being rebutted only by a strong showing, not a mere inference, given the consequence of shifting the burden of justification for exercise of the peremptory challenge to the party exercising the challenge. Thereafter, if a prima facie case of a *Wheeler* violation is established, the court in considering all the evidence need only find there exists a reasonable inference of exclusion because of group bias alone. To incorporate the "reasonable inference" standard into the prima facie showing might easily transform removal of each and every prospective juror belonging to a cognizable group into a *Wheeler* hearing. Further, a reduction of the prima facie standard to a "reasonable inference" test would reduce the trial court's discretion and judgment at a time when it is uniquely situated to observe the nature and extent of voir dire as well as the attitude and awareness of the challenged prospective juror.

Second, the Supreme Court has *consistently* recognized it is the burden of the defendant pursuing a *Wheeler* motion to show, as part of a prima facie case of group bias, a "strong likelihood" of exclusion because of a group association. (See *People* v. *Garceau* (1993) 6 Cal.4th 140, 170-171 [24 Cal.Rptr.2d 664, 862 P.2d 664].) ■ A defendant may not simply rely upon exclusion of the group-associated prospective jurors in establishing "a strong likelihood" of removal because of group bias. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Rather, a defendant should underscore "other relevant circumstances, such as prospective jurors' characteristics, the nature of the prosecutor's voir dire, or the prospective jurors' answers to questions. . . ." (*Ibid.*)

■ In this case, the trial court correctly recognized Bernard's prima facie responsibility under *Wheeler* was to show, by a "strong likelihood," exclusion of prospective jurors because of group bias alone.

■ We now turn to the question of whether the trial court correctly denied Bernard's *Wheeler* motions on the basis no prima facie case of group bias was shown. ■ In such a circumstance, the reviewing court is to examine the entire record for evidence to support the trial court's ruling, and, because a *Wheeler* motion places a premium on the personal observations of the trial court, "considerable deference" is given to the ruling. (*People* v. *Howard, supra,* 1 Cal.4th at p. 1155; accord, *People* v. *Sanders* (1990) 51 Cal.3d 471, 498 [273 Cal.Rptr. 537, 797 P.2d 561].)

■ The trial court initially questioned a panel of 48 prospective jurors and then allowed counsel to participate in voir dire. Counsel for Bernard asked the court to inquire into possible bias because Bernard, an African-American, had dated a White woman and the victim was White. The trial court agreed to, and did so inquire.

The jury panel included five African-Americans:[3] James Coleman, Irving Hollins, Lorene Welch, Marc Taylorwade and Gwen Nicholson.

The prosecutor's peremptory challenge of Marc Taylorwade brought Bernard's first *Wheeler* motion, to which the court responded:

"The second prong of the [*Wheeler*] test requires that the individual or individuals in question be members of a cognizable group within the meaning of the representative cross-section rule. The court can certainly conclude that blacks are among those cognizable groups that [*Wheeler*] was aimed at.

---

[3]Both sides have represented in their briefs a total of five African-Americans were included on the panel of forty-eight prospective jurors. This is confirmed by the record. The prosecutor's peremptory challenge of Marc Taylorwade prompted Bernard's first *Wheeler* motion, and the prosecutor's peremptory challenge of Gwen Nicholson prompted his second *Wheeler* motion. Both *Wheeler* motions were timely.

"The third criteri[on] or step of the court was toward all the circumstances of the case, whether or not there exist[ed] a strong likelihood that the person, Marc Taylorwade, who has been challenged is being challenged of group association rather than because of any specific bias.

"If the three pronged [*Wheeler*] criteria are met that raises or meets the requirement of a prima facie showing, that would necessitate me then requiring the district attorney to present evidence as to the basis for the challenge.

"The motion is going to be denied on the following grounds: as I question the panel as a whole with regard to the race issue and the issue that you, [defense counsel], requested that I inquire them of, I would only characterize Marc Taylorwade's response to be at best, and I don't mean his verbal responses, more his facial responses and his reaction to the responses of other individuals, as cavalier.

"As these questions were then asked by both of you, his reaction to them continued to be in the same manner. In this particular case based upon the information that you have presented to me, both of you have presented to me it would appear that there is going to be a tremendous amount of evidence to be presented in this case. There are going to be certain things that might constitute racial overtones that need to be resolved.

"It would in my mind be a disservice to this defendant at this point in time and certainly a disservice to the People to have someone on the panel who in my mind has exhibited the attitude Marc Taylorwade has. If I have misread it, then it is my error. But I don't believe that I have.

"The motion is denied."

The prosecutor's peremptory challenge of prospective juror Gwen Nicholson was the basis of Bernard's second *Wheeler* motion, which resulted in the following dialogue and ruling of the trial court:

"THE COURT: [Defense counsel?]

"[DEFENSE COUNSEL]: Yes, your Honor, thank you. At this time I would make a [*Wheeler*] challenge to the district attorney's use of peremptory challenge 28, Gwen Nicholson for the records, Gwen Nicholson is an African[-]American female and my client as noted in the earlier motion is an African[-]American male. Gwen Nicholson let us list her duties as. an assistant deputy probation officer. She has indicated I believe she was

divorced from a member of the marine corps, has two adult children one of whom works for the L.A. Sheriff's Department.

"And she has had prior jury experience, prior jury duty on a rape case. She works in juvenile hall as part of her duties. And has several friends in the probation department. She has had several criminal justice classes as a requirement. She is unsure of the charges, but I believe she is the second African[-]American person struck from the jury by the district attorney. There were five to begin with. . . .

"THE COURT: Two remain and one was struck by defense?

"[DEFENSE COUNSEL]: That's correct, your Honor. And two women and three men. And it seems to me that Gwen Nicholson holds herself out to be a person involved somewhat with law enforcement, depending upon how you—because it is the probation officer's job that she has a great depth of experience and appears to be a good juror.

"And it's our assertion the challenge is based upon race. And it is the second. And I might also add to the court that in terms of the—by my count 12 people who are left off of this panel that would cut down the number of African[-]Americans from three to two.

"And I also have authority for the proposition that just because there are other African[-]American people on the jury that does not mean that the judge cannot grant a *Wheeler* motion.

"THE COURT: The court will find that the first criteri[on] has been met. You stated for the record what you need to have on there. Gwen Nicholson is a member of a cognizable group, black Americans.

"As to the third criteri[on] of *Wheeler* it indicates that there must be a showing based upon all the circumstances that there is a strong likelihood that she is being challenged because of her group association rather than any specific bias. I do not feel I can make that finding at this point. The motion will be denied."

The record establishes, as discussed, *ante*, the trial court was conversant with the *Wheeler* test and applied it with respect to both motions. The trial court's reading of Marc Taylorwade as "cavalier" with an inappropriate attitude was certainly relevant (*People* v. *Sanders*, *supra*, 51 Cal.3d at p. 501) and an observation to which we defer as, obviously, the trial court was in a far better position to judge such a circumstance than any reviewing court.

Similarly, the trial court's ruling it could not find a strong likelihood group bias was the cause of Gwen Nicholson being excused by the prosecution is entitled to substantial weight and bolstered by the following relevant circumstances: the prosecution excused only two of five African-Americans on the panel, two African-Americans became members of the jury, and the voir dire of Gwen Nicholson by the court could not be construed as "desultory." (*Wheeler, supra,* 22 Cal.3d at p. 281.)

Simply put, Bernard failed to establish his threshold *Wheeler* burden by showing a strong likelihood the prosecution used peremptory challenges to excuse prospective jurors because of group bias. Thus, the burden never shifted to the prosecution to justify its peremptory challenges of Marc Taylorwade and Gwen Nicholson. Rather, it was the responsibility of the trial court to make express rulings on whether Bernard met his prima facie showing requirement. (See *People v. Fuentes, supra,* 54 Cal.3d at p. 716, fn. 5; accord, *People v. Howard, supra,* 1 Cal.4th at pp. 1156-1157.) The trial court clearly fulfilled its responsibility in this regard.

## B. *Felony-Murder Theories*

Bernard argues the trial court erred when it permitted the prosecution to present to the jury theories of felony-murder kidnapping and felony-murder kidnapping for robbery. Specifically, Bernard claims because the kidnapping special circumstances were dismissed prior to trial and the only charged felony murder theory remaining was felony murder/robbery, he was deprived of his constitutional right to notice of the charge against him and was, in effect, "ambushed." Bernard's contention does not withstand scrutiny.

The record in this case discloses an amended information was filed after the preliminary hearing adding the special circumstances of felon-murder kidnapping (§ 190.2, subd. (a)(17)(ii)), felony-murder robbery (§ 190.2, subd. (a)(17)(i)), and murder while lying in wait (§ 190.2, subd. (a)(15)). Additional counts of kidnapping (count 3) and kidnapping for robbery (count 4) were amended into the information as well.

Thereafter, pursuant to Bernard's motion to set aside the information (§ 995) as to the special circumstances, the special circumstances of murder while lying in wait and felony-murder kidnapping were dismissed; the motion, however, was denied as to the special circumstance of felony-murder robbery.

After completion of the evidence at trial, there was considerable colloquy between the court and counsel concerning instructing the jury on theories of

felony-murder kidnapping and felony-murder kidnapping for robbery. Initially, the trial court indicated it was granting the prosecution's request to have the information amended to add these theories of felony murder, although both the prosecutor and the trial court expressed doubt as to whether such an amendment was even necessary for the jury to be instructed as to the additional theories. Later, the trial court stated it was unnecessary for the information to be amended, and "to the extent any amendment to the complaint was done, [it was not appropriate]." The trial court thereafter instructed the jury on the felony murder theories of which Bernard now complains.

Bernard argues that even though he was charged with kidnapping and kidnapping for robbery, this provided no notice the prosecution would rely on a theory of felony-murder kidnapping.

In *People* v. *Johnson* (1991) 233 Cal.App.3d 425, 453-457 [284 Cal.Rptr. 579], the defendant was charged with murder. The information charged neither felony murder nor the underlying felony of attempted robbery. The trial court, nevertheless, instructed the jury on felony murder and the jury returned a verdict of first degree murder. The defendant in *Johnson* made the same claim of error Bernard asserts: allowing the prosecution to proceed with an uncharged felony murder theory provided insufficient notice to defend. As in *Johnson*, we reject this claim.

First, as *Johnson* underscores, it is not necessary to separately charge a defendant with either a felony-murder theory or the underlying felony. Felony murder and premeditated murder are not distinct crimes; rather, they constitute "two kinds of first degree murder" requiring different elements of proof. (*People* v. *Johnson*, *supra*, 233 Cal.App.3d at p. 454; *People* v. *Scott* (1991) 229 Cal.App.3d 707, 713 [280 Cal.Rptr. 274]; *People* v. *Guerra* (1985) 40 Cal.3d 377, 386 [220 Cal.Rptr. 374, 708 P.2d 1252].)

Second, even though it was unnecessary for the underlying felonies to have been charged in order for the prosecution to argue for felony murder, in fact the underlying felonies were charged in this case. The amended information clearly put Bernard on notice the prosecution would press for felony murder.

Third, the evidence and Bernard's theory of defense charged him with notice of the prospect of felony murder. Bernard testified he pulled a gun on Brue and forced him to drive to the Green Valley Truck Trail where the murder eventually occurred. Bernard's theory of defense was predicated upon lack of responsibility due to alcohol and a racial epithet. Under these

circumstances Bernard was not the victim of a prosecutorial "ambush" as he claims. For that reason, the case of *Sheppard* v. *Rees* (9th Cir. 1989) 909 F.2d 1234, 1236, cited by Bernard is clearly distinguishable.

In *Sheppard*, the prosecution admitted, on appeal, it had "ambushed" defense counsel in a case where the defendant had been charged with one count of murder and with use of a firearm in connection with a "debt" from a cocaine transaction. At no time during pretrial proceedings or the taking of testimony during trial was the prospect of felony murder ever raised, directly or indirectly. Even during last minute discussions regarding jury instruction there was no mention of felony murder. At that juncture, proceedings were adjourned with argument and the settled jury instructions to be given the following day. The next morning, the prosecution's request for jury instructions on robbery and felony murder was granted. The *Sheppard* court noted as grounds for issuance of a writ of habeas corpus following a murder conviction a pattern of governmental conduct which affirmatively misled defense counsel.

As we have noted, this case bears no resemblance to *Sheppard*[4] as the specter of felony murder consistently confronted Bernard from the pleading stage through the evidence presented at trial including his own theory of the case. The trial court here did not err in allowing the case to be presented to the jury on felony-murder kidnapping and felony-murder kidnapping for robbery theories.

## C. *Reasonable Doubt Instructions*

 Bernard next contends instructional error occurred when the trial court charged the jury with CALJIC No. 2.90 which defines reasonable doubt. Specifically, Bernard contends the instruction reduces the prosecution's burden of proof from *evidentiary* certainty to *moral* judgment. This argument has been recently rejected by the United States Supreme Court. (*Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed 583, 590-599, 114 S.Ct. 1239, 1242-1250].)

## D. *Great Bodily Injury Enhancement*

Bernard submits the trial court erred by staying the sentence for count 2 (second degree robbery) but imposing a consecutive three-year enhancement for great bodily injury (§ 12022.7) on that count. The People concede the

---

[4]Other cases have readily distinguished *Sheppard*. (See *People* v. *Gallego* (1990) 52 Cal.3d 115, 189 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Johnson, supra*, 233 Cal.App.3d at pp. 456-457.)

error as a result of the imposition of the three-year consecutive sentence and we agree the sentence for the enhancement should have been stayed under the circumstances. (*People* v. *Mustafaa* (1994) 22 Cal.App.4th 1305 [28 Cal.Rptr.2d 172]; *People* v. *Guilford* (1984) 151 Cal.App.3d 406, 411-412 [198 Cal.Rptr. 700].)

### DISPOSITION

The judgment is modified by striking the three-year enhancement for great bodily injury as to count two. The superior court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections. In all other respects the judgment is affirmed.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied August 26, 1994, and appellant's petition for review by the Supreme Court was denied November 17, 1994. Mosk, J., was of the opinion that the petition should be granted.