[No. B081386. Second Dist., Div. Three. June 27, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY L. DOUGLAS, Defendant and Appellant.

**COUNSEL**

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Kenneth C. Byrne and Emilio E. Varanini IV, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant Terry L. Douglas appeals from the judgment entered following his conviction by jury of six counts of second degree robbery with the personal use of a firearm (counts 1, 4-8—Pen. Code §§ 211, 12022.5, subd. (a)) and two counts of attempted second degree robbery with the personal use of a firearm (counts 3 & 9—Pen. Code, §§ 664/211, 12022.5, subd. (a)), and the finding by the trial court he had suffered a prior serious felony conviction (Pen. Code, § 667, subd. (a)) and had served a prison term with the meaning of Penal Code section 667.5, subdivision (b). He was sentenced to the five-year upper term as to count 5 plus the five-year upper term for the use enhancement with one-year consecutive terms for each of the remaining robberies and eight-month consecutive terms for both of the attempted second degree robberies plus a one-year, four-month term for each of the corresponding use enhancements together with five years for the prior serious felony conviction, for a total term of thirty years, eight months.

### FACTUAL AND PROCEDURAL BACKGROUND

About 11:30 p.m. on August 14, 1993, Gertrude Traver (count 1) and her daughter were sitting in the 'Til Two Club in Long Beach when a Black man in dark clothes, later identified as Douglas, entered the bar, pointed a gun at the face of the bartender, Jeri Lujan (count 5), and said, "This is a holdup. Give me your money, bitch." He then waived the gun around and ordered the patrons to put their "hands up" and "heads down." After walking behind the bar, Douglas put the gun to the side of Lujan's head and demanded the money. She opened the register and as Douglas took the money out, he said, "Bitch, give me some money. I know you have some more money." She replied she did not have access to any more, and he replied, "I know you're lying, bitch. Give me some money." Lujan kicked the cupboard and said, "Down there." At the time, she had her face covered with her hands to protect herself from Douglas's gun which was at the side of her head so she did not see whether Douglas took the money from the cupboard. Douglas then grabbed Traver's purse and some money Traver's husband had left on the bar.

Traver's husband, George, (count 3, attempt), and William Lujan were at the pool table about 30 feet away from the bar when Douglas came in brandishing his gun. From where he was standing, George could see the bar and a man behind it, about five feet, six inches to five feet, seven inches tall, who was dressed in dark clothes and armed with a gun. William Lujan waved at him to get down and he complied. After the incident was over, he could not find the $11 that he had left on the bar. He said he had stayed at the pool table and did not go over to protect his property because the man had a gun.

Another patron, Richard Stamper (count 4), was sitting at the bar that night when he saw Douglas enter the club displaying a gun. Douglas ordered the people at the bar to "Get your wallets. Put them on the bar." Stamper put his wallet on the bar and laid his head down. He saw Douglas start grabbing money out of the cash register and the next thing he knew, someone took his wallet. Somebody else came by later and asked him for his wallet and he replied someone had grabbed it. Another man yelled, "Hurry up. we're been here too long" and Douglas left. The police later returned his wallet to his friend, Richard Villescas, who in turn returned it to him the next day at work.

Pierre Gigure (count 6) was also sitting at the bar when Douglas entered with the gun. After complying with Douglas's order to put his face down, he saw Douglas go up to the bartender and force her to open up the cash register. The $7 he had on the bar was taken.

Richard Villescas (count 7) was sitting with Stamper at the bar. He also saw the gun, heard Douglas say it was a "holdup" and observed Douglas take money from the register, as well as money and various purses from the bar. Douglas took his wallet as well as two $20 bills he had left on the top of the bar. Later the police returned his wallet to him.

Orie DeLoch (count 8), who was sitting at the bar on the night of the incident, also followed Douglas's orders, including giving him his wallet. It was returned to him about a month later.

Randy Krininger (count 9, attempt) was about five feet from the door when Douglas entered. He had no wallet and no money and Douglas passed by him.

John Leonard was in the bar when Douglas entered but was able to exit out the rear during the robberies. He called 911 and stayed at the telephone

booth until the police arrived. Leonard gave the police a description of the car he saw leave the bar and later, they drove him to a place a few blocks away where he identified Douglas in an in-field showup.

Sometime after 11:30 p.m. on the night of the incident, Long Beach Police Officers Jeffrey Cooper and William McDonald were advised to be on the lookout for a brown Cadillac Seville. Shortly thereafter, they saw such a vehicle with either three or four occupants inside. The officers activated their lights in an attempt to pull the vehicle over and the car sped up. The officers pursued the vehicle through numerous stop signs and at speeds up to 60 miles per hour. During the chase, some items were tossed out of the car. As the car approached 25th Street, the doors opened and three occupants, including Douglas ran away.

Both Cooper and McDonald followed Douglas, who was carrying a gun. They lost him after he jumped a fence and went into someone's backyard. The officers contained the area around the backyard, and Long Beach Police Officer James Jones from the K-9 division took his police dog into the contained area. The dog alerted the officer to Douglas, who was hiding under a tarp on the roof of the garage. Three of the victims' wallets and two of the victims' purses were found in the Cadillac. During the booking search, $469 were retrieved from Douglas's pockets and pants leg as well as two .9-millimeter rounds from his sock.

Mark Galloway saw the car chase as it went by his house and also saw the objects being thrown from the Cadillac. Later, he retrieved a gun and some .9-millimeter bullets which he gave to the police.

## CONTENTIONS

Douglas contends (1) the trial court erred by denying his motion for a continuance which was made in conjunction with a motion for self-representation; (2) the trial court erred by denying defense counsel's objections to the prosecutor's use of preemptory challenges to discharge two prospective Black jurors; (3) the evidence was insufficient to prove the attempted robbery that was charged and found in count 3; and (4) the "aggravated" firearm use enhancement term must be reduced to a "middle" term.

## DISCUSSION

### 1. *The trial court did not improperly deny Douglas's motion for continuance.*

■ Douglas's contention the court erred by denying his motion for a continuance which was made in conjunction with his motion for self-representation is without merit. The record shows that at his arraignment on September 14, 1993, a hearing was held pursuant to *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] during which Douglas complained his attorney was misrepresenting him because "she got in an argument with [his] mother," she should have given him transcripts of his case, and he wanted a photo lineup. After defense counsel replied the present case did not involve an identification issue but was an intoxication issue, the trial court denied Douglas's request to dismiss his attorney, and at his arraignment, he was advised his trial date would be November 2, 1993. His case was continued several times thereafter until November 8, and at no time did Douglas present a *Faretta* v. *California* (1975) 422 U.S. 806, 832-836 [45 L.Ed.2d 562, 579-582, 95 S.Ct. 2525] (*Faretta*) request to proceed in propria persona.

On the day his trial was to begin, defense counsel stated her client felt he "personally" was not ready to go to trial at this time and wished to address the court. Douglas stated he had not prepared himself to go to trial because he did not know he was going to trial that day and had believed he was going to a "pretrial." When advised he had been informed of his trial date at his arraignment and that this was the last week to try his case, Douglas stated he would like to "waive time" to "prepare" himself for trial. When asked what he needed to do, he replied he "would like to go pro per" but was not ready to try his case that afternoon. The following colloquy then occurred:

"The Court: If I grant you pro per status, I won't give you a continuance. You will have to try the case yourself without the assistance of an attorney, because you've waited to this stage, and it's too late to go for a continuance to represent yourself, if you want to . . . , and I find that you're competent . . . , and you do have that right, . . . but I won't give you time to get ready.

"The Defendant: What if I go pro per? [A]in't no use going pro per if you ain't got no access to the law library.

"The Court: The Sheriff's Department has provisions for the law library. . . .

"I have a feeling, though, that you're asking to go pro per to get a continuance in the case rather than really wanting to represent yourself .

"[A]gain, if you are competent, I'll give you pro per status, but I won't give you a continuance.

". . . . . . . . . . . . . . . . . . .

"Are you sure you want to represent yourself this afternoon in jury selection?

"The Defendant: I don't want to represent myself this afternoon, because I feel I ain't ready . . . .

"The Court: [¶] . . . [¶] Do you want an attorney with you during this jury selection and trial, or do you want to sit there by yourself . . . .

"The Defendant: It really don't make a difference.

"The Court: It does. You're entitled to a fair trial, and really, the way for you to get a fair trial is to have an attorney represent you here, but it's your choice.

"The Defendant: I might as well hang myself .

". . . . . . . . . . . . . . . . . . .

"The Defendant: I'll go along with it.

"The Court: With what?

"The Defendant: Attorney.

"The Court: Okay. Good choice."

In order to invoke an unconditional right of self-representation, a defendant must make a timely motion, in advance of trial, with an appreciation of the consequences. (*Faretta, supra,* 422 U.S. at pp. 832-836 [45 L.Ed.2d at pp. 579-582].) Motions made on the day preceding or the day of trial have

been considered untimely. (*People* v. *Burton* (1989) 48 Cal.3d 843, 852 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Moore* (1988) 47 Cal.3d 63, 79-81 [252 Cal.Rptr. 494, 762 P.2d 1218].) It is true that if a court grants a defendant's untimely *Faretta* request, it must also grant a reasonable continuance, if necessary, so that defendant may prepare for trial. (*People* v. *Clark* (1992) 3 Cal.4th 41, 110 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People* v. *Wilkins* (1990) 225 Cal.App.3d 299, 304 [275 Cal.Rptr. 74].) However, if the court determines the defendant's request is merely a tactic designed to delay the trial, the court has the discretion to deny the continuance and require the defendant to proceed to trial as scheduled either with his counsel or in propria persona. (See *U.S.* v. *Flewitt* (9th Cir. 1989) 874 F.2d 669, 674-675; see also *People* v. *Courts* (1985) 37 Cal.3d 784, 792, fn. 4 [210 Cal.Rptr. 193, 693 P.2d 778].)

Here, at no point did Douglas claim he and his counsel had not cooperated in preparing his defense or that they disagreed. (Cf. *People* v. *Wilkins, supra,* 225 Cal.App.3d at p. 305, fn. 3.) From the record it appears, as the trial court concluded, Douglas requested a continuance strictly as a delaying tactic and not because he needed time to prepare a defense. Under these circumstances, the trial court did not abuse its discretion in conditioning its grant of Douglas's *Faretta* motion on proceeding to trial as scheduled and in refusing to grant a continuance. There was no error.

2. *The trial court properly denied Douglas's Wheeler motion.*

■ Douglas's contention the trial court erred in failing to find a prima facie case of discrimination by the prosecutor in his use of two peremptory challenges to excuse two prospective Black jurors is without merit.[1] From the record it appears there were only three Black jurors in the initial panel of prospective jurors available for selection. With his second peremptory challenge, the prosecutor excused a Black prospective juror, Carrie Thomas. The trial court denied defense counsel's *Wheeler* motion (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], and finding no prima facie showing of group bias had been made, it stated, "There are ample reasons why a prosecutor objectively would excuse her without regard to race. [¶] She was also very low-keyed and tentative in her answers. [¶] In any event, her family problems would justify the peremptory."[2]

The prosecutor then used a peremptory challenge to excuse Geraldine Henderson, another prospective Black juror. Defense counsel again made a

---

[1]Douglas is Black.

[2]Carrie Thomas had a nephew with an extensive criminal history; her brother had been convicted of rape, although he denied having committed the crime; and her sister had spent time in jail on a drug charge. In fact, she apparently felt her family members' contacts with the criminal justice system were so extensive she asked to discuss these matters in private.

*Wheeler* motion and, the trial court denied the motion on the ground the defense had failed to make a prima facie showing and thus no burden arose for the prosecutor to give race-neutral explanations. The record shows Geraldine Henderson had a son who had committed grand theft auto, had been in and out of trouble since then and had been sentenced to prison.

The record shows, as the trial court found, defense counsel failed to establish a prima facie showing of systematic exclusion of a minority race. The fact that prospective jurors have indicated they could be fair and impartial does not suffice to establish a prima facie case. (See *People* v. *Turner* (1994) 8 Cal.4th 137, 167 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Contrary to Douglas's arguments, the use of peremptory challenges to exclude prospective jurors whose relatives and/or family members have had negative experiences with the criminal justice system is not unconstitutional. (See *People* v. *Garceau* (1993) 6 Cal.4th 140, 172 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1]; *People* v. *Walker* (1988) 47 Cal.3d 605, 626 [253 Cal.Rptr. 863, 765 P.2d 70].)

Both of these excluded prospective jurors had family members who had had negative experiences with law enforcement. In addition, Carrie Thomas's responses were "tentative" and "low-keyed." (See *People* v. *Perez* (1994) 29 Cal.App.4th 1313, 1329 [35 Cal.Rptr.2d 103].) In addition, it appears a Black juror remained on the impaneled jury. (Cf. *People* v. *Turner*, *supra*, 8 Cal.4th at p. 168; cf. also *People* v. *Bernard* (1994) 27 Cal.App.4th 458, 469 [32 Cal.Rptr.2d 486].) Under these circumstances, the prosecutor properly exercised his peremptory challenges in excusing Carrie Thomas and Geraldine Henderson and the trial court did not err in finding Douglas failed to make a prima facie showing of group bias and in denying his *Wheeler* motions. (See *People* v. *Wimberly* (1992) 5 Cal.App.4th 773, 782-784 [7 Cal.Rptr.2d 152].)

3. *Substantial evidence supported Douglas's conviction for attempted robbery (count 3).*

■ Douglas's contention there was insufficient evidence to support his conviction for attempted robbery (count 3) is without merit. He argues that since George Traver was at the pool table, 30 feet away from the bar, it was impossible for him to be able to take Traver's property from his "immediate presence."

" 'The generally accepted definition of immediate presence . . . is that " '[a] thing is in the [immediate] presence of a person, in respect to robbery,

which is so within his reach, . . . observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.' " ' [Citation.] 'Under this definition, property may be found to be in the victim's immediate presence even though it is located in another room of the house, or in another building on [the] premises." ' [Citation.]" (*People* v. *Prieto* (1993) 15 Cal.App.4th 210, 214 [18 Cal.Rptr.2d 761].)

Here, although Traver was 30 feet from the bar, the record shows Traver could see Douglas had a gun and that Douglas was at the bar. Traver stated he stayed behind the pool table because Douglas had a gun. Thus, it appears that if Douglas had not had a gun and Traver had not been prevented from doing so by fear, he could have easily gone over to the bar where Douglas was standing. There was substantial evidence that Douglas exhibited a threat of force against Traver as a patron in the bar, that Traver was in the general vicinity of the robbery, that the element of "immediate presence" was satisfied, and that Douglas was guilty of the attempted robbery of Traver (count 3).

### 4. *Firearm use enhancement.*

Apart from Douglas's failure to object to his sentence at the sentencing hearing (*People* v. *Neal* (1993) 19 Cal.App.4th 1114, 1117 [24 Cal.Rptr.2d 129]), Douglas's contention the trial court improperly imposed an upper term firearm use enhancement is without merit and his assertion the trial court's reasons for imposing the aggravating term were insufficient is unavailing. In sentencing Douglas to the five-year upper term for the firearm use, the trial court stated, "So far as the use allegations, regarding Ms. Lujan, I find that, in aggravation, the weapon was pointed at her, at a very close distance. [¶] The defendant made very threatening comments to her involving the use of the gun and terrified her, and I think that even though the weapon was not fired at her, that those are extremely aggravating circumstances mandating the high term for the use."

As the trial court stated, aggravating factors existed beyond that which would result from mere use of the gun itself. The evidence shows circumstances beyond that which was necessary for finding use of the gun. Douglas did not merely possess or display a handgun. Instead, after he entered the bar, he pointed it at the victim's face and then, after ordering her to give him the money, he used the gun to threaten her into complying with his request by putting the gun to the side of her head at very close range. The manner in which he used the gun clearly involved the threat of great bodily harm,

which, contrary to Douglas's argument, is a factor legally sufficient to justify imposition of the upper term. (Cf. *People* v. *Dixon* (1993) 20 Cal.App.4th 1029, 1030 [25 Cal.Rptr.2d 208].) In any event, the record also reflects other aggravating factors, any one of which is sufficient to justify imposition of the upper term, such as the fact Douglas was on parole at the time of the instant offense; his performance, while on parole, was unsatisfactory; he had numerous adult and juvenile convictions; and he had served prior prison terms. (See *People* v. *Hall* (1994) 8 Cal.4th 950, 961, 963 [35 Cal.Rptr.2d 432, 883 P.2d 974].) Under these circumstances, it is not reasonably probable that a different result would occur upon remand. (*People* v. *Scott* (1988) 200 Cal.App.3d 1090, 1095-1096 [246 Cal.Rptr. 406]; *People* v. *Burrell-Hart* (1987) 192 Cal.App.3d 593, 601 [237 Cal.Rptr. 654].)

## DISPOSITION

The judgment is affirmed.

Croskey, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 4, 1995.