Filed 7/7/22  P. v. McShane CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076993 |
| v. | (Super.Ct.No. FRE05916) |
| DOUGLAS BRIAN McSHANE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino.  Ronald M. Christianson, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Acting Senior Assistant Attorney General, and Arlene A. Sevidal, Robin Urbanski, and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

1

Three teenagers attempted to steal a truck belonging to defendant Douglas Brian McShane. He got a shotgun and went looking for them. When he found them, in a dark field, he shot one of them — a 15-year-old boy — killing him. He told police that he fired to protect himself. At trial, he claimed that he fired to protect his adult son, who had accompanied him.

As a result, defendant was convicted of second degree murder, with a firearm enhancement. When he appealed, we affirmed the conviction; however, we reversed the sentence and remanded so that the trial court could consider whether to strike or reduce the firearm enhancement.

On remand, the trial court did reduce the firearm enhancement. That reduced the sentence on the enhancement from an indeterminate 25 years to life to a determinate 20 years, which reduced the total sentence from 40 years to life to 35 years to life.

In this appeal, defendant contends that the trial court abused its discretion by failing to reduce the firearm enhancement even more. He argues that, in light of his age (38 when he started accruing custody credit), a sentence of 35 years to life means that he has no reasonable possibility of being paroled during his "meaningful life."

Defendant is not a wholly unsympathetic character. Nevertheless, the trial court, after carefully weighing all of the circumstances, *did* reduce the firearm enhancement. That decision was within its discretion. There is no metric by which we can say that it should have reduced the enhancement still further. Defendant has no absolute right to a

2

chance at parole; however, we also note that, under the Elderly Parole Program (Pen. Code, § 3055),[1] he will be eligible for parole next year, despite the trial court's sentence.

I

STATEMENT OF FACTS

The following facts are taken verbatim from our opinion in defendant's previous appeal. (*People v. McShane* (June 14, 2019, E069547) 2019 Cal. App. LEXIS 541 [nonpub. opn.].)

A. *February 6: The Altercation at the Mobile Home*.

Defendant lived with his son Brian, age 17, and his daughter Kristi, age 15. His children were home-schooled; they had a "tight-knit" group of friends who were also home-schooled. These included Kristi's best friend, Heather Ryan. They also included Jerel Cobbs, Damien Saunders, and Devin Humphrey. Devin's mobile home, near defendant's house, was a "gathering place" for the group.

Around January 27, 2003, defendant's daughter ran away from home; she went to live with a 21-year-old man whom she had met just three days earlier.

On February 6, 2003, defendant showed up at Devin's mobile home. Six or seven teenagers were there, including Heather, Damien, and Jerel. Defendant asked if they knew where his daughter was; they said they did not.[2]

---

[1] All further statutory citations are to the Penal Code.

[2] According to Heather, she genuinely did not know where Kristi was. According to Kristi, however, Heather knew where she was but had promised not to tell defendant.

3

Defendant got upset; he called Heather a "liar" and a "whore." Devin's mother asked defendant to leave, but he refused. Damien grabbed defendant and tried to push him outside; defendant tried to shake him off. After a "scuffle," defendant left.

B.  *February 10:  The Shooting of Jerel.*

On the night of February 10-11, 2003, Heather, Jerel, and Damien were once again hanging out at the mobile home. Kristi told Heather to take defendant's truck and bring it to her, so she could use it to go to Utah with her boyfriend.[3]

Around 11:30 p.m., Heather, Jerel, and Damien left the mobile home, went to an open field across the street from defendant's house, and waited. When they thought defendant was asleep, they tried to take his truck.

Previously, Heather had seen defendant's son Brian take defendant's truck without permission; Brian used a spoon to pop out the rear window and to start the truck. Accordingly, the trio popped out the rear window and started to roll the truck out of the driveway.

Defendant woke up and started yelling at them. They ran west. When they saw defendant's car, coming from his house, they hid in some bushes. They then saw defendant going back toward his house. They jumped a fence and ran to the next street south. When they got there, they saw defendant's car a third time. They hid by some

---

[3]     Heather testified that Kristi asked her to take the truck in a phone call that night. Kristi testified, however, that she had asked Heather, Jerel, and Damien to take the truck the day before, when they were all at her new boyfriend's house.

4

buildings until it went past, then ran north again and into the field.  They were heading for the mobile home.

Defendant, however, drove right into the field.  Heather dropped to the ground.  A few minutes later, she saw Jerel run east, directly across the beams of defendant's headlights.

Defendant fired one blast from the shotgun.  Two pellets hit Jerel in the back.  One went through his heart and lung.  He died within minutes from internal bleeding.

Heather estimated the time from when she ran from defendant's house to when the shot was fired as 45 minutes to an hour.

According to Heather, defendant's son Brian was with him.  Brian checked on Jerel, then walked back to defendant; Heather heard them say something about calling the police.  Defendant and Brian then went back home, leaving the car in the field.

At 1:46 a.m., defendant called 911.  A sheriff's deputy  arrived at defendant's home while he was still on the phone with 911.  Defendant was "shaky and upset."  A shotgun was lying on a nearby dresser.

After the shooting, defendant's blood tested positive for marijuana.  Marijuana is detectable in the blood for "a few days" after use.

C.    *Defendant's Account*.

1.    *Defendant's testimony*.

Defendant had been using marijuana off and on since he was 17.  Recently, his regular supplier had disappeared; his new supplier sold "chronic," which was much

5

stronger than regular marijuana. Two or three weeks before the shooting, defendant got into a minor car accident because the chronic "made [him] lost" and he "didn't know which way to turn."

On February 6, 2003, according to defendant, he spoke to Heather on the phone; Heather said she knew where Kristi was, but she was not "at liberty to tell" defendant. He went over to the mobile home because he was not "satisfied with that information."

About an hour after leaving the mobile home, defendant realized he had left his phone and his hat there. He phoned and said he was coming over to get them. A "guy" named Kenneth brought them out to him. Defendant said, "Tell those guys they don't have to worry about me." He said that because he "wanted everything to be peaceful."

On February 10, 2003, defendant went to bed at 10:00 or 10:30 p.m. Right before going to bed, he smoked some marijuana.

Between 1:15 and 1:30 a.m., defendant was awakened by the sound of his cat "meow growling." As he went to let the cat out, he saw two people pushing his truck. When they saw him, they ran away.

At first, he ran after them, even though he was not wearing any shoes. They "veer[ed]" briefly into the yard of a house where some Mexicans lived. This made him think the Mexicans might be the people he was chasing.

When they ran into some bushes, defendant stopped, because he was afraid they might have a weapon. He went back home and put on shoes; he also got his shotgun and

6

loaded it with three shells.  The shotgun was to protect himself and to scare the thieves.  He used the shotgun for hunting and, every two or three weeks, for target shooting.

Defendant did not call 911, because when he had called the police about thefts in the past, they told him if he did not see the thieves, they could not do anything.

He got in his car and circled the block three times, looking for the thieves.  He then cut across the field to look behind some buildings on the other side.  He saw three people, with their backs to him.

He drove back home and told his son Brian, "They're out in the field, there's three of them, go call the police."  He then drove back into the field.

Instead of calling police, however, Brian walked over and into the field.  When defendant realized Brian was in the field, where the thieves could attack him, he became "hyper panick[ed]."  He stopped his car and jumped out, holding his shotgun.

He saw a person running toward Brian.  He "fired the shot in panic."  His intention was to protect Brian.  However, he did not intend to hurt or kill the other person.  He thought he would "knock [the person] down, . . . see who it was, and then . . . let them get up and run away."  He "forgot that the gun was dangerous."

Brian checked the body and said, "It's Gene."  Gene was an adult who hung out with Kristi and her friends.  This was when defendant first thought that the thieves might be some of Kristi's friends.

7

2. *Defendant's previous statements*.

a. *Defendant's 911 call*.

During the 911 call, defendant was crying; he kept telling the operator to hurry. He said he had just shot one of three teenagers who had tried to steal his truck. As he was going through the field, they "jumped up" and "were coming at" him, so he fired.

He added that, on the previous Thursday, the teenagers had "jumped" him. His daughter had run away; they knew where she was but would not tell him. He got mad at them, and they all got mad at him.

b. *Defendant's statement to the deputy*.

Defendant's statement to the deputy was largely consistent with his testimony at trial, except as follows.

He told the deputy that, when he first got in his car, Brian came with him; after driving around a while, however, he dropped Brian off and told him to call the police.

Defendant loaded his shotgun with only one shell, and only after he drove into the field, although before he got out of his car. As he was walking, three people stood up. He fired because he feared for his safety. He said the reason for the confrontation was that he had gone to a mobile home to look for his runaway daughter, and the people there had threatened to "kick his ass." He insisted that he did not intend to shoot anybody.

By the end of the interview, defendant "was sobbing with his head between his knees[.]"

c. *Defendant's testimony at the first trial.*

Defendant's testimony at his first trial was largely consistent with his testimony at the present trial.

D. *Expert Testimony.*

Dr. Frank Sheridan, an expert forensic pathologist, testified that marijuana "impairs cognitive functioning" and can "affect quite a wide range of perceptions to varying degrees . . . ."

Dr. Robert Suiter testified for the defense as an expert forensic psychologist. He diagnosed defendant as having a "bipolar-related disorder." At the time of the crime, defendant was "experiencing a heightened degree of anxiety . . . ." His thought processes were "borderline delusion[al] in terms of his fearfulness of the situation and certain persons." His mental disorder would have made him even more likely than the ordinary person to be irrational in an "extremely fearful, stressful, fast-breaking situation." It was possible that defendant could fire a shotgun at someone, just to knock them down, without thinking that they might be hurt or killed.

Dr. Robert Brodie, also an expert forensic psychologist, testified on rebuttal for the prosecution. In his opinion, defendant's behavior at the time of the crime indicated that he was not anxious, but rather frustrated, angry, and determined to find the thieves. Also in his opinion, defendant did not have a mental disorder. He conceded, however, that even people who are not mentally ill can act irrationally in an emergency.

9

## II

## STATEMENT OF THE CASE

In 2003, when defendant was arrested, he was 38. He remained in custody before trial; thus, he was also 38 when he started accruing custody credit against his eventual sentence. He was a high school graduate and had been in the same job, as a mechanic, for five years. He had no prior record.

In 2005, a jury found defendant guilty of second degree murder. (§ 187, subd. (a).) It also found true a series of greater and lesser included firearm enhancements. (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d).) Defendant was sentenced to a total of 40 years to life in prison. In 2008, we affirmed. (*People v. McShane* (Jan. 31, 2008, E039494) 2008 Cal.App. Unpub. LEXIS 924 [nonpub. opn.].) In 2014, a federal district court denied defendant's habeas petition. (*McShane v. Cate* (C.D.Cal., July 30, 2014, No. ED CV 09-1243-GW (PJW)) 2014 U.S.Dist. LEXIS 104815 [nonpub. opn.].) In 2016, however, a federal appellate court reversed and held that defendant was entitled to habeas based on ineffective assistance of counsel. (*McShane v. Cate* (9th Cir. 2016) 636 Fed. Appx. 410 [nonpub. opn.].)

In 2017, a jury once again found defendant guilty of second degree murder and found all of the firearm enhancements true. And once again, defendant was sentenced to a total of 40 years to life in prison, consisting of 15 years to life on the second degree murder conviction plus 25 years to life on the greatest firearm enhancement.

Defendant appealed. We affirmed the conviction. However, while the appeal was pending, sections 12022.5, subdivision (c), and 12022.53, subdivision (h) had gone into effect. These gave a trial court discretion to dismiss a firearm enhancement in the interest of justice. Thus, we held that defendant was entitled to a remand so the trial court could exercise that discretion. (*People v. McShane* (2019) 248 Cal.Rptr.3d 322, review granted Sep. 18, 2019, S257018, review dism. and cause remanded Aug. 26, 2020.)

On remand, defendant asked the trial court to strike all but the least of the firearm enhancements. He argued that: (1) he was "a flawed but decent man who made a terrible mistake"; (2) he "was a longtime gainfully employed, diligent provider and single father [who] was having trouble with a runaway teenage daughter"; (3) he brought the shotgun along for protection, not to commit murder; (4) he had no prior convictions other than a misdemeanor conviction around 1993 for driving under the influence; (5) he had had no disciplinary violations in prison; (6) his hiatal hernia was not being properly treated in prison; (7) he would not be released on parole unless and until he was rehabilitated; (8) an enhancement of 25 years to life for firearm use is disproportionate to the punishment for murder and to the punishment for the use of a nonfirearm deadly weapon; (9) he had shown remorse by inquiring into how he could apologize to the victim's family; and (10) no possible penalty would bring the victim back. He denied lying or giving inconsistent accounts. Defendant also filed letters from people who knew him, attesting to his remorse and his good character.

11

The prosecution argued against striking any enhancements, because defendant: (1) intended to kill, or at least showed conscious disregard for human life; (2) did personally and intentionally use a firearm, causing death; (3) made false, contradictory, and/or self-serving statements to minimize his culpability; (4) adversely impacted the victim's family, which wanted him held accountable; and (5) according to the probation officer, lacked remorse.

The trial court dismissed the greatest firearm enhancement. (§ 12022.53, subd. (d).) Thus, it imposed a sentence of 20 years on the second-greatest firearm enhancement (§ 12022.53, subd. (c)), for a total sentence of 35 years to life. In a written ruling explaining its decision, it said:

"Victim Impact

"At the sentencing hearing, the victim's father provided a powerful statement about the victim, his impact on the family while he was alive, and the continuing effect that his murder has on the family's lives. At the time of the killing, the victim was fifteen years old with the prospects of a life full of potential ahead of him, all of which was cut short by the defendant's actions.

"Deterrence

"The crime of second degree murder is punishable by a sentence of 15 years to life in prison. . . . [¶]

12

" . . . [T]he actual use of the firearm in the commission of the offense . . . greatly enhances the sentence for any killing. . . . These increased punishments are primarily imposed as a deterrent to gun usage in the commission of violent crimes.

"Circumstances of the Offense

" . . . This was not a case where the defendant merely grabbed a loaded gun and fired. The weapon used was a shotgun which the defendant had to load prior to using. He drove around the neighborhood several times with the loaded shotgun in the vehicle. Upon finally stopping the vehicle, he exited with the shotgun and fired the shot that killed the victim.

"Circumstances Involving the Defendant

"The defendant had no prior record at the time of the offense. He was described as having a lack of remorse by the probation officer, and clearly was more concerned about his own circumstances than that of the victim and the victim's family. That being said, he has used his time in custody to better himself and others. He seems to have developed some genuine remorse and empathy for the victim's family. His conduct in prison has been good and he has been involved in faith-based work helping other inmates.

"**EXERCISE OF DISCRETION**

"The majority of the above discussion points toward not changing the previously imposed sentence. However, the defendant's lack of prior record and his conduct while

13

serving his prison sentence are factors that weigh in favor of some exercise of discretion."

III

DISCUSSION

Section 12022.53, subdivision (d) is an enhancement of 25 years to life that applies when the defendant "personally and intentionally discharge[d] a firearm and proximately cause[d] great bodily injury . . . or death . . . ."

Section 12022.53, subdivision (c) is an enhancement of 20 years that applies when the defendant "personally and intentionally discharge[d] a firearm . . . ."

Section 12022.53, subdivision (b) is an enhancement of 10 years that applies when the defendant "personally use[d] a firearm . . . ."

These three enhancements apply only to specified crimes, including murder. (§ 12022.53, subd. (a).)

By contrast, section 12022.5, subdivision (a) applies to any felony. It is an enhancement of 3, 4, or 10 years that applies when the defendant "personally use[d] a firearm . . . ."

"The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss [a firearm] enhancement . . . ." (§§ 12022.5, subd. (c), 12022.53, subd. (h).)

"The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is

14

based upon an 'individualized consideration of the offense, the offender, and the public interest.' [Citation.]" (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) Thus, in deciding whether to strike a firearm enhancement, the trial court must consider whether, in light of the totality of the circumstances, the defendant may be deemed outside the spirit of the firearm enhancement scheme. (See *People v. Williams* (1998) 17 Cal.4th 148, 161 [standards for striking "strike" prior].)

"The factors that the trial court must consider when determining whether to strike a firearm enhancement . . . are the same factors the trial court must consider when handing down a sentence in the first instance." (*People v. Pearson* (2019) 38 Cal.App.5th 112, 117.) "In addition to the factors expressly listed for determining whether to strike enhancements listed in California Rules of Court, rule 4.428(b), the trial court is also to consider the factors listed in California Rules of Court, rule 4.410 (listing general objectives in sentencing), as well as circumstances in aggravation and mitigation under California Rules of Court, rules 4.421 and 4.423." (*Ibid*.) These factors are "not exhaustive"; the trial court can use any "criteria reasonably related to the decision being made." (Cal. Rules of Court, rule 4.408(a); see also *id*., rules 4.421(c). 4.423(c).) The trial court can take into account the defendant's postsentence conduct in prison. (*People v. Yanaga* (2020) 58 Cal.App.5th 619, 625-628.)

"'[A] court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is' reviewable for abuse of discretion. [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 373; see also *id*. at p. 374.)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citation.] Second, a "'decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that *no reasonable person* could agree with it." (*People v. Carmony*, *supra*, 33 Cal.4th at pp. 376-377, italics added.)

Here, the trial court properly considered victim impact. At least in a capital case, "victim impact evidence is admissible as an aggravating factor. [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 165, 197, disapproved on other grounds in *People v. Elizalde* (2015) 61 Cal.4th 523, 538, fn. 9.) Logically, it is equally relevant in a noncapital case. (See § 1191.1 ["The court in imposing sentence shall consider the statements of victims, parents or guardians, and next of kin"].) And while every life is precious, the murder of a teenager is generally regarded as more heinous than the murder of an adult.

The trial court also properly considered deterrence. The "[g]eneral objectives of sentencing" include "[p]rotecting society," "[d]eterring others from criminal conduct by demonstrating its consequences," "[p]reventing the defendant from committing new

16

crimes by isolating him or her for the period of incarceration," and "[e]ncouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses . . . ."  (Cal. Rules of Court, rule 4.410(a)(1), (a)(3), (a)(4), (a)(5).)

The trial court then properly considered the way defendant used the shotgun.  One of the aggravating factors listed in the rules is that "[t]he defendant was armed with or used a weapon at the time of the commission of the crime . . . ."  (Cal. Rules of Court, rule 4.421(a)(2).)  Defendant argues that, when the question is whether to strike a personal firearm use enhancement, this factor is irrelevant, because it will always apply. We agree.  "An aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.'  [Citations.]"  (*People v. Black* (2007) 41 Cal.4th 799, 817, overruled on other grounds in *Cunningham v. California* (2007) 549 U.S. 270.) However, it does not appear that the trial court used the *fact* of firearm use as an aggravating factor.  Rather, it relied on the *manner* in which defendant used the shotgun: "This was not a case where the defendant merely grabbed a loaded gun and fired.  The weapon used was a shotgun which the defendant had to load prior to using.  He drove around the neighborhood several times with the loaded shotgun in the vehicle."  (See *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1691-1692 [trial court properly imposed upper term on firearm enhancement based on manner in which the defendant used gun]; *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1312 [same].)  It could reasonably find that use of the shotgun in this manner made the enhancement distinctively worse than the ordinary.

Defendant points to a number of what he claims are mitigating factors: (1) he showed remorse, (2) he had an "inconsequential" criminal record, (3) he had an "impeccable record of good behavior while in custody", (4) he "did not start the sequence of events", (5) he acted in "misguided . . . self[-]defense", and (6) he had mental health issues.

The trial court *acknowledged*, however, that defendant "had no prior record" and had "[good] conduct while serving his prison sentence." For these very reasons, it *granted* the motion, even if only in part.

It also agreed that defendant "seems to have developed . . . remorse." It suggested, however, that this was balanced out or even outweighed by his initial lack of remorse. This reasoning was not irrational or arbitrary.

Similarly, it could have good reasons for giving little weight to the other mitigating factors that defendant lists. While defendant did not "start the sequence of events," it could properly find this outweighed by the fact that he escalated it by bringing a loaded firearm and then firing it with the intent to kill. While he claimed he acted in self-defense, a jury had already rejected his imperfect self-defense claim. And while Dr. Brodie conceded that defendant had had two prior psychiatric hospitalizations, in 1989 and 2001, he testified that defendant was not suffering from any mental disorder at the time of the crime.

In sum, the trial court properly found some aggravating factors and some mitigating factors (though not as many of the latter as defendant would like). It weighed

18

them against each other and concluded that it should reduce the effect of the firearm enhancement from 25 years to life to a fixed 20 years. Defendant is in the untenable position of arguing that 20 years is indisputably the wrong number and 10 years (or 4, or 3, or 0) is indisputably the right number. "'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in qualitative as well as quantitative terms.' [Citation.] One factor alone may warrant imposition of the upper term [citation]" — or, as here, the greater firearm enhancement — "and the trial court need not state reasons for minimizing or disregarding circumstances in mitigation [citation]." (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401.) "An appellate court is not authorized to substitute its judgment of the relative weights of aggravating and mitigating factors properly considered by the trial court. [Citations.]" (*People v. Zichwic* (2001) 94 Cal.App.4th 944, 961.)

The bottom line, in defendant's view, is that he is somehow entitled to a sentence that would give him the possibility of parole during "any quality years he has left." It is not clear what legal principle he believes entitles him to such a sentence. Even assuming such a principle exists, the trial court's decision did not violate it. Section 3055 establishes the Elderly Parole Program. It makes "any inmate who is 50 years of age or older and has served a minimum of 20 years of continuous incarceration" eligible for parole. (§ 3055, subd. (a); see also *id.*, subd. (e).) "Incarceration" includes "detention in a city or county jail . . . or a Department of Corrections and Rehabilitation facility." (§ 3055, subd. (b)(2).) Section 3055 also requires the Board of Parole Hearings to "give

19

special consideration to whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence." (§ 3055, subd. (c).) Thus, defendant will be eligible for parole in 2023, when he is 58.

In our view, the bottom line is that there is no principled reason why a 10-year enhancement is appropriate but a 20-year enhancement is not. Defendant's trial counsel made a moving pitch for striking the enhancements.[4] Defendant's appellate counsel has made an equally moving pitch, even invoking Portia's "quality of mercy" speech from *The Merchant of Venice*. These are appeals to emotion, not principle. Even if we were swayed, evidently the trial court was not, and we cannot say that that was irrational or arbitrary. We therefore conclude that the trial court did not abuse its discretion.

IV

EFFECT OF AMENDMENTS TO SECTION 1385

In supplemental briefing, defendant contends that, under the current version of section 1385, as amended effective January 1, 2022, the firearm enhancement must be stricken.

Section 1385 now provides, as relevant here, that if "[t]he application of an enhancement could result in a sentence of over 20 years . . . , the enhancement shall be

---

[4]     Among other things, he stated, under penalty of perjury, "Every original (non-quoted) word I write in this motion is what I personally recall, perceive, and believe. Nothing I say is merely a position taken by an advocate on behalf of a client." "[Defendant] he does not have the character most people associate with murder. He can be selfish, stupid, and interpersonally impolitic (as can I and pretty much everyone), but he's not evil. In my opinion, he's actually pretty good."

20

dismissed." (§ 1385, subd. (c)(3)(c).) However, it also provides, "This subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision." (*Id.*, subd. (c)(7).)

Because defendant was sentenced before the amendment became effective, it does not apply to him. "When new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date. [Citation.]" (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.) However, "the presumption does not govern when the statute at issue includes a 'saving clause' providing that the amendment should be applied only prospectively. [Citations.]" (*People v. Conley* (2016) 63 Cal.4th 646, 656.) The amendment to section 1385 includes precisely such a saving clause, making it prospective only.

V

DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                                                                            P. J.


We concur:

CODRINGTON
                    J.

FIELDS
                    J.


21